No. 121,447

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CATHERINE ROLL, a disabled person, by and through her co-guardians
TERESA ROLL KERWICK and MARY ANN BURNS,
*Appellants*,

v.

LAURA HOWARD, SECRETARY OF THE KANSAS DEPARTMENT FOR AGING
AND DISABILITY SERVICES, and MIKE DIXON, SUPERINTENDENT
OF THE PARSONS STATE HOSPITAL AND TRAINING CENTER,
*Appellees*.

SYLLABUS BY THE COURT

1.

Appellate courts defer to a district court's factual findings when they are supported by substantial competent evidence in the record. Substantial competent evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.

2.

Appellate courts do not reweigh the evidence or make determinations about the credibility of witnesses. Instead, appellate courts view the evidence in the light most favorable to the prevailing party, disregarding conflicting evidence or other inferences that might be drawn.

3.

A person seeking permanent injunctive relief must show that five factors weigh in favor of the requested injunction. First and foremost, the person seeking a permanent injunction must prevail on the merits of his or her claim. But though the success on the merits weighs heavily in favor of issuing an injunction, the person seeking injunctive

1

relief must also demonstrate that the absence of an injunction would lead to irreparable harm; that no adequate legal remedy exists to address the person's claim; that the person's injury would outweigh the harm any injunction may cause to the opposing party; and that the injunction, if issued, would not be adverse to the public interest.

4.

Appellate courts review the grant or denial of injunctive relief for an abuse of discretion. The scope of that discretion varies based on the contours of the issues presented to the district court. A district court has no discretion to make errors of law.

5.

The interpretation of the Americans with Disabilities Act and its regulations is a question of law appellate courts review de novo.

6.

When interpreting statutes, courts' primary aim is to determine the intent of the body enacting the legislation. Courts look to the plain language of the statute or regulation in question, giving common words their ordinary meanings. But this analysis does not occur in isolation. Rather, courts must consider the various provisions of an act in context—*in pari materia*—and seek to reconcile those provisions into workable harmony.

7.

Unjustified segregation of persons with mental-health conditions in an institution constitutes discrimination under Title II of the Americans with Disabilities Act. To determine whether unjustified discrimination—and thus a violation of the ADA—exists, courts apply a three-pronged test: A public entity has the duty to move patients from an institutional setting to a community-based setting when (1) its treatment professionals determine that such placement is appropriate, (2) the affected persons do not oppose such

treatment, and (3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

8.

If a patient opposes receiving treatment in a more integrated environment, as Roll has here, the Americans with Disabilities Act does not require integration. But a person's opposition does not deprive the institution of the power to place a person into a more integrated environment.

9.

Courts apply a two-part, burden-shifting test when determining whether a federal law creates a right enforceable under 42 U.S.C. § 1983 (2018). The plaintiff bears the initial burden to demonstrate that a law creates an enforceable right by establishing three factors. First, Congress must have intended the provision to benefit the plaintiff. Second, the right cannot be so vague and amorphous that it would be difficult for courts to enforce. And third, the statute must unambiguously impose a binding obligation on the States. Meeting these three factors creates a presumption of enforceability. The burden then shifts to the State, which may rebut that presumption by demonstrating a congressional intent to foreclose enforcement through § 1983.

10.

Medicaid's "freedom of choice" provision under the Social Security Act, 42 U.S.C. § 1396n(c)(2)(C) (2018), creates an individual right that can be enforced under 42 U.S.C. § 1983.

11.

Under the Social Security Act, persons who are determined to be likely to require the level of care provided in a hospital must be informed of feasible alternatives to inpatient hospital services. And those individuals must be given the choice of either

institutional or home and community-based services. This choice only arises, however, when a court has determined someone is likely to require the level of care provided in a hospital or one of the other facilities listed in the Act.

Appeal from Sedgwick District Court; FAITH A.J. MAUGHAN, judge. Opinion filed December 11, 2020. Affirmed.

*David P. Calvert*, of David P. Calvert, P.A., of Wichita, and *Stephen M. Kerwick*, of Wichita, for appellants.

*Arthur S. Chalmers*, assistant attorney general, and *Derek Schmidt*, attorney general, for appellees.

Before WARNER, P.J., STANDRIDGE and GARDNER, JJ.

WARNER, J.: Catherine Roll is a patient at Parsons State Hospital, where she has lived and been treated for an intellectual disability and schizophrenia for several decades. In 2016, the Department for Aging and Disability Services, in conjunction with Parsons, indicated an intent to transfer Roll to a more integrated community-based treatment program (though the specific program where she would be transferred was not yet determined). Roll's guardians sought a permanent injunction to prevent the transfer, alleging the Americans with Disabilities Act (ADA) and the Social Security Act (SSA) prevented the Department from transferring her without her consent.

After a trial, the district court found that the Department had shown that the treatment available at a community-based program was appropriate to meet Roll's needs. The court also found that, because Parsons provided a level of care and restriction beyond what was medically necessary, neither the ADA nor the SSA prevented the State from transferring her to a different program. After carefully reviewing the record and the parties' arguments, we find the district court's crucial finding—that Roll does not need to

4

be treated in a facility as restrictive as Parsons—is supported by the record. And we agree that there is no right under the ADA and SSA for patients to remain at a more restrictive facility if the level of care provided is medically unnecessary. Thus, we affirm the district court's denial of the permanent injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

Catherine Roll's parents brought her to Parsons State Hospital in 1970, when she was 15 years old, to treat her intellectual disability and schizophrenia. She has lived there for the past 50 years. Roll's parents passed away in the 1990s and her two sisters, Teresa Kerwick and Mary Ann Burns, have served as her guardians since that time.

Parsons provides housing and treatment for individuals with intellectual disabilities and mental-health conditions. To qualify for admission (and to receive state and federal funding), applicants must have an intellectual disability (which begins at an IQ of 70) and demonstrate active treatment needs. Once admitted, patients live in communal housing units called cottages. A team of professionals creates an active treatment program to identify the needs of and assess each patient. Staff, who have often worked at Parsons for several years if not decades, monitor and inform patients of their progress at monthly and annual reviews.

*Roll is identified as appropriate for transfer to a community-based treatment facility.*

When Roll was admitted to Parsons, individuals were often admitted to institutions because their families could not adequately address their needs. But a series of societal and treatment-based changes beginning in the late 1970s enabled individuals to live their lives outside of institutions. New medications addressed mental-health issues while advances in educational technology allowed the needs of individuals with intellectual disabilities to be met at home or through noninstitutional, community-based services.

5

These changes in treatment affected Parsons in at least two important ways. First, expectations about the extent and duration of institutionalization have evolved. A preference has emerged to treat individuals in more integrated settings—such as community-based treatment programs that provide individuals opportunities to interact with both disabled and nondisabled persons—rather than the isolated environment of an institution such as Parsons. The goal of institutional treatment is no longer to "cure" a mental disability, as it was in the early 1970s, but to return a patient to a community-based program that adequately addresses his or her treatment needs. In other words, a person's treatment at Parsons should only last until he or she can successfully transition to a more integrated setting.

Second, as individuals have transitioned out of Parsons and into new community-based programs, the profile of Parsons' treatment population has changed. As individuals with less severe conditions have moved out, the proportion of patients with much more severe conditions increased. Most of Parsons' incoming patients now have a severe behavioral issue, such as aggression, self-injury, or sexual conditions such as pedophilia, and have generally been transferred either from incarceration or a state psychiatric hospital.

In 2010, former Governor Mark Parkinson issued an executive order recommending that state hospitals serving individuals with developmental disabilities downsize as, among other reasons, a cost-cutting measure. More recently, Parsons identified two concerns with keeping patients who could live in community-based environments: staff resources and bed space. Patients with less severe conditions require staff supervision that could otherwise be spent on monitoring patients with more severe conditions, and their place in a cottage could be more appropriately used by someone on the hospital's waiting list. To address these concerns, Parsons Superintendent Dr. Jerry Rea asked staff in December 2015 to identify individuals who could be successfully transferred to community placements. Staff identified 21 patients, including Roll.

To gauge Roll's level of cognitive and physical function, Parsons staff have administered the Vineland-II test, which measures adaptive functioning—the ability to perform everyday skills—in 11 areas across 4 domains: communication, daily living skills, socialization, and motor skills. The test contextualizes the test taker's skill levels by comparing them to the age at which a person from the general population (which includes individuals without developmental disabilities) would demonstrate similar skills. In a test administered in July 2012, Roll exhibited skills across the tested areas equivalent to a person between the age of 2½ and 8½ years old.

Roll receives a very low dose of a psychotropic medication to prevent symptoms of withdrawal associated with a previous medication for her schizophrenia. She does not appear to display any schizophrenic symptoms. She has a moderate intellectual disability, which generally means that she requires physical assistance in performing some tasks but requires only verbal prompts to perform others.

*The guardians oppose Roll's transfer to a community-based treatment program.*

Roll's guardians have historically been opposed to transferring her to a community placement. In 2002, Parsons believed Roll would do well in a community placement and encouraged the guardians to tour a few facilities where she might be transferred. Roll's guardians toured three, but they did not believe any were suitable for her. The guardians expressed their desire at that time that Roll not be transferred to a community placement.

In February or March 2016, a Parsons social worker called Kerwick to inform her that Roll had been selected to transition into a community-based treatment program. Kerwick replied she would not approve a transition. During a subsequent call, Parsons staff set up a meeting between Kerwick and Dr. Rea to discuss community placement. During the meeting in late March, Dr. Rea explained his rationale for transferring Roll—

Parsons currently treats patients with more severe conditions, these patients present safety concerns to other patients, and a $1.3 million decrease in Parsons' budget would require closing a cottage (each of which provides housing and treatment for about 20 patients). Kerwick agreed to tour some facilities with Burns, but due to her sister's schedule, the tours would have to be in the summer.

In early June, Dr. Rea sent a letter to Roll's guardians in an effort to pressure them to begin considering community-placement options. His letter stated that Parsons would transfer Roll to their care if they had not begun the community-placement transfer process by September 1.

In July, the guardians toured several facilities, but they still preferred Parsons to the community-based facilities they visited. Because Roll had remained at Parsons for the past 50 years, she had developed a routine there: she wakes up when she wants, eats breakfast, may choose to work in the Parsons library, returns to her cottage to eat lunch and take a nap, spends the afternoon doing leisure activities, and goes to bed when she wants. The guardians believed the community-placement facilities they toured would not afford Roll that same level of comfort and freedom. She would have to be outside her home for at least 20 hours per week at times dictated by a day-services program, and she would spend those hours in a crowded setting. Though community placement would give Roll some freedoms Parsons does not provide—input in meal selection, fewer housemates, and possibly a private bedroom—Roll's guardians did not believe that those benefits outweighed the stability of her long duration at Parsons.

*Roll's guardians file suit to enjoin the transfer.*

In August 2016, Roll (through her guardians) filed a petition seeking an injunction and temporary restraining order to prevent the Department and Parsons from discharging her, either to a community-based program or to the guardians' care. The petition alleged

that the ADA prohibited the State from transferring Roll to a community-based facility without her (and her guardians') consent. The district court granted the temporary restraining order and later appointed a guardian ad litem to represent Roll's interests.

After reviewing various hospital reports on Roll's condition (though without speaking with Roll or any of the treating professionals at Parsons), the guardian ad litem initially reported that he believed it was in Roll's best interests to remain at Parsons until a proper community placement could be found. The guardian ad litem later filed a second letter after meeting with Roll and speaking with treatment professionals at two community-based programs. In that second letter, the guardian ad litem indicated that the "advantages of community placement appear to be less residents in one location, having [Roll's] own bedroom or sharing with one person, some choice in meals, meal preparation and perhaps more freedom to do other things." The drawbacks were that Parsons "has been her home for a very long time, she is happy, familiar with the residents, staff and the routine." He indicated that he would advise Roll's guardians to meet with the facilities he contacted to "see if it might be beneficial for Ms. Roll to be placed in the community."

The district court held a four-day bench trial in October 2018. Several members of Parsons' treatment staff and two professionals from resource centers for community-based treatment testified—from a medical, social, and psychological standpoint—that Roll's treatment needs could be adequately met in a community-based setting. The Parsons staff and physicians underscored that Roll is one of the calmest and least severe patients at the hospital, and that she could receive similar but more integrated treatment in a community setting. And some also noted the downsides of remaining at Parsons: Tammy Manues, a member of the treatment staff, indicated that from time to time multiple residents with more serious conditions who lived in Roll's cottage would become upset and act out—"hollering out" or "screaming." During those outbursts, Roll would withdraw to her room and essentially "shut[] down."

9

The guardian ad litem also testified briefly at trial. Though he had not spoken with any of Roll's treating staff or any other medical professional to discuss her records, he testified that, given Roll's age and the length of time she had been at Parsons, it would not be in her best interests to transfer her to a different facility. He emphasized that Roll was happy where she was and had a predictable routine. When asked how Roll's age and the length of her stay at Parsons might affect her transition, Heather Pace, a witness from one of the resource centers, indicated that she believed that there would likely be an initial transition period that was difficult, given Roll's extended treatment at the hospital and settled routine. But Pace also stated that the transition would be easier *because* Roll enjoyed a set routine—that "once you get through and get over the bump of the transition, you settle into a new routine and life goes back to some kind of normalcy and it gets better again."

Roll's guardians testified about Roll generally, her history, and the reasons why they believed keeping her at Parsons was in her best interests. They also testified at length about their dismay at receiving Dr. Rea's letter in June 2016 (which indicated a need to find an alternative placement by September 2016 to avoid a discharge) and their reasons for not consenting to any transfer.

After the trial, the court granted Roll's guardians permission to add a claim under the SSA that the proposed transfer from Parsons violated Roll's right to choose which facility would provide her treatment. The parties submitted lengthy proposed findings of fact and conclusions of law, as well as trial briefs on the ADA and SSA claims.

The district court denied the requested injunction in a lengthy journal entry. The court found that the evidence presented at trial supported Parsons' position that Roll's treatment needs could be adequately addressed in a community-based setting—a setting more integrated and less restrictive than Parsons' institutionalized approach. The court explained:

10

"Ms. Roll's Social Work Assessment Annual Reviews, Psychological Annual Reviews, and Individual Program Plans from 2010 through 2017 supports good cause for her discharge. This documentation collectively speaks to the very issue of the adaptive living skills Ms. Roll has developed over time which make her appropriate for placement in a less restrictive living environment. This documentation, in conjunction with testimony offered by staff of Parsons State Hospital, provides evidence to the Court of her desire to partake in community based activities, her ability to work and earn wages, her ability to take care of her own hygiene needs, her ability to dress herself, her ability to exercise choices about daily living, her ability to perform various tasks to include setting a table, maintaining her bedroom, assisting with sweeping and mopping, doing art projects, working on puzzles, shopping, going out to eat, attending church, partaking in religious studies, reading her bible, reading magazines or the newspaper and communicating her wants, needs and desires.

"In addition, various staff of Parsons State Hospital testified that Ms. Roll's needs could be easily met in the community. This evidence was supported by numerous defense exhibits including documents setting forth a comparison of services between Parsons State Hospital and various community service agencies, an illustration of the types of services offered by Parsons State Hospital and an analogous counterpart through community-based services, a listing of various community outings Ms. Roll participated in monthly, from October of 2017 through August of 2018 and a tracking summary describing Ms. Roll's performance in reaching, maintaining and exceeding training objectives of the Informed Consent for Behavior Support Program/Medication from 2009 through 2017."

Turning to Roll's legal claims, the district court found she could not prevail on her claims under the ADA and SSA. As to the ADA claim, the court found that Roll's (or her guardians') opposition did not prevent the Department from transferring her to an appropriate, more integrated treatment setting. And the court found that Kansas was permitted, under the SSA, to pay for appropriate community-based treatment, which the Department proposed here.

11

Because Roll and her guardians had not prevailed on these legal claims, they could not meet the first requirement for a permanent injunction—success on the merits—or recover attorney fees. This appeal followed.

## DISCUSSION

The petition Roll's guardians filed on her behalf sought an injunction to prevent the Department from transferring her from Parsons. Roll did challenge Parsons' position that a community-based program was an appropriate treatment setting for her. But the focus of her case was *consent*. The petition pointed out that Roll and her guardians had not agreed to a transfer from Parsons. And it argued that federal law—provisions of the ADA and SSA—provided a right to refuse more integrated treatment than Parsons provides. Under these provisions, Roll argued, Parsons could not transfer her to a different facility without her (or her guardians') consent.

The district court found that Roll had not prevailed on her legal claims under the ADA and SSA and therefore denied her request for an injunction. On appeal, Roll challenges the district court's legal conclusions from several angles:

- She argues that the court used an incorrect standard for evaluating her claims and that the court's legal conclusions regarding the ADA and SSA are contrary to the law.

- She argues that several of the court's factual findings—primarily relating to Roll's treatment needs and her consent—are contrary to compelling evidence in the record.

- She argues that various other decisions and journal entries by the court were incorrect. And she asserts that because, in her view, the district court should have

granted the requested injunction, it also should have granted her request for attorney fees.

For the reasons we explain in this opinion, we conclude that Roll does not have a right under either the ADA or the SSA to demand a higher level of treatment in a less-integrated setting than is appropriate. And we find there is ample evidence in the record to support the district court's finding that Roll's treatment needs can be appropriately addressed in a community-based setting. Thus, even though we agree with Roll that neither she nor her guardians have consented to a transfer from Parsons to a community-based setting, federal law does not demand her consent before a transfer to an appropriate treatment setting may occur. As Roll cannot prevail on the merits of her claims, we affirm the district court's denial of a permanent injunction.

1. *Substantial evidence supports the district court's finding that Roll's treatment needs can be appropriately met in a community-based treatment program.*

Roll's primary arguments on appeal relate to whether the ADA and SSA provide a right to refuse the proposed transfer to a community-based treatment program. Before we can analyze those claims, however, we must have a clear view of the facts underlying the district court's analysis. We thus turn to Roll's challenges to the district court's factual findings.

The district court's journal entry included more than 25 pages of factual findings, as well as additional factual findings and analysis throughout the court's other written analyses. Roll—through her guardians—asserts that several of the court's factual findings regarding her abilities and treatment needs are either unsupported by the record or contrary to other evidence presented. She also claims that the district court disregarded important evidence that mitigated its findings, such as the guardian ad litem's reports and testimony.

13

Because appellate court judges are not present at trial, we defer to a district court's factual findings when they are supported by substantial competent evidence in the record. Substantial competent evidence is "'evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.'" *Wiles v. American Family Life Assurance Co*., 302 Kan. 66, 73, 350 P.3d 1071 (2015). Appellate courts do not reweigh the evidence or make determinations about the credibility of witnesses. Instead, we view the evidence in the light most favorable to the prevailing party, disregarding conflicting evidence or other inferences that might be drawn. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

In paragraph 27 of its factual findings, the district court summarized the evidence it relied on for its determination that Roll was "appropriate for community placement," explaining:

> "This was established by testimony from Dr. Rea who was employed with Parsons State Hospital since 1984; Social Work Supervisor/ Ombudsman Karen VanLeeuwen who was employed at Parsons State Hospital for 31 years; Qualified Intellectual Disability Professional Nathan Grommet who was employed with Parsons State Hospital since 2014; Activity Specialist Cory Medlam who was employed with Parsons State Hospital for 6 years; Dr. Menon who was employed with Parsons State Hospital since 1977; Client Training Supervisor Nancy Holding who was employed with Parsons State Hospital since 1986; and Direct Support Worker Tammy Manues who was employed with Parsons State Hospital since 1991. Each of these individuals are personally familiar with Ms. Roll and worked with her in various capacities."

The court expanded on this summary later in its journal entry, observing:

> "Ms. Roll is appropriate for placement in a less restrictive living environment for several reasons. Ms. Roll does not display behavioral issues which would indicate she has active treatment needs. Given that Ms. Roll has no active treatment needs, members of Ms.

14

Roll's treatment team at Parsons State Hospital have simply been providing supervision to Ms. Roll, which can be accomplished in a community based setting."

And the court concluded its decision by explaining that the assessments by Parsons staff that Roll's needs could be appropriately met in a community-based treatment program was supported by "Roll's Social Work Assessment Annual Reviews, Psychological Annual Reviews, and Individual Program Plans," as well as

"documents setting forth a comparison of services between Parsons State Hospital and various community service agencies, an illustration of the types of services offered by Parsons State Hospital and an analogous counterpart through community-based services, a listing of various community outings Ms. Roll participated in monthly, from October of 2017 through August of 2018 and a tracking summary describing Ms. Roll's performance in reaching, maintaining and exceeding training objectives of the Informed Consent for Behavior Support Program/Medication from 2009 through 2017."

Roll attempts to undermine this broad finding—that the evidence supports the assessment of Parsons staff that Roll can be appropriately treated in a community-based program—by challenging several individual findings by the district court regarding her abilities and treatment needs. For example, Roll, through her guardians, argues that findings by the district court regarding her ability to read (or understand what she is reading), function without verbal prompts, or play the piano are contradicted by conflicting evidence presented at trial. Roll also argues that the district court's finding that she was not in "active treatment" conflicts with the testimony of her guardians and others. And Roll notes that after touring two community-based programs, her guardians testified that in their opinion neither would be able to provide the level of treatment she received at Parsons.

These arguments are not persuasive on appeal, however. It is not this court's role to reweigh the conflicting testimony and evidence before the district court. Rather, we

must determine whether there is evidence in the record to support the court's findings. Having reviewed the record of the trial, we conclude there is. For example, Parsons staff testified that Roll would often sit by herself and read magazines, the newspaper, or the Bible. The district court found that during the afternoon, Roll would "work on puzzles, read magazines, read the newspaper or her bible." Contrary to Roll's arguments on appeal, the court did not make any finding regarding Roll's level of comprehension of that material. Similarly, Roll's argument as to whether she is in "active treatment" reflects a difference of opinion between what Roll's guardians believe to be active treatment and the descriptions of the Parsons medical staff; the district court's finding is supported by substantial competent evidence in the record.

But more importantly, the district court's finding regarding the appropriateness of community-based treatment did not center on any of Roll's particular abilities or challenges. Instead, it was based on the testimony and documentary evidence provided by the doctors and staff at Parsons—the only medical professionals to testify throughout the trial—who explained that a community setting would adequately address Roll's treatment needs. Though the guardians disagreed, often vehemently, with this assessment and continue to do so on appeal, the fact remains that the court's finding is supported by extensive evidence in the record.

Finally, Roll correctly points out that the district court's journal entry makes no reference to the guardian ad litem's reports or testimony. A district court does not have discretion to disregard undisputed relevant evidence. See *State v. Smith*, 303 Kan. 673, 679, 366 P.3d 226 (2016). But the guardian ad litem's conclusions in this case were contested. The guardian ad litem concluded that it would be in Roll's best interests, given her age and settled routine, to remain at Parsons. During his testimony, the guardian ad litem admitted that though he had reviewed Roll's medical and psychological assessments, he had not spoken with any of the medical professionals who treated her— and who had reached the opposite conclusion. Nor did he provide any opinion on whether

16

Roll would be able to successfully transition to a community-based program, though other witnesses did. In short, the district court's failure to reference or analyze the guardian ad litem's position in its written opinion does not undermine its finding that community-based treatment can appropriately serve Roll's needs. Accord *Garetson Brothers v. American Warrior, Inc.*, 51 Kan. App. 2d 370, 387, 347 P.3d 687 (2015) (finding the district court "did not ignore undisputed evidence," but rather "weighed the conflicting evidence—which included [the Division of Water Resources'] final report— and made factual findings"), *rev. denied* 303 Kan. 1077 (2016).

The district court's finding that Roll's treatment needs can be adequately addressed in a community-based treatment program is supported by substantial competent evidence.

2.     *The Americans with Disabilities Act and the Social Security Act do not provide Roll the relief she seeks.*

Having determined that the evidence in the record supports the district court's factual finding about the adequacy of community-based treatment, we turn to the question of whether the district court erred when it denied the permanent injunction. Though the court analyzed multiple factors in its analysis, the primary reason for its denial was the court's conclusion that Roll could not succeed as a matter of law on her claims under the SSA or the ADA.

Injunctions are equitable remedies. A person seeking permanent injunctive relief—in this case, an order to permanently prevent the Department from transferring Roll to a different facility—must show that five factors weigh in favor of the requested injunction. First and foremost, the person seeking a permanent injunction must prevail on the merits of his or her claim—he or she must "actually succeed[] on the merits of the lawsuit . . . after a final determination of the controversy." *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 410, 266 P.3d 516 (2011); see also *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012); *Husky Ventures, Inc. v. B55 Investments,*

*Ltd.*, 911 F.3d 1000, 1011 (10th Cir. 2018) (listing standards for obtaining a permanent injunction under federal law). Though the success on the merits weighs heavily in favor of issuing an injunction, the person seeking injunctive relief must also demonstrate that the absence of an injunction would lead to irreparable harm; that no adequate legal remedy exists to address the person's claim; that the person's injury would outweigh the harm any injunction may cause to the opposing party; and that the injunction, if issued, would not be adverse to the public interest. See *Downtown Bar and Grill*, 294 Kan. at 191 ); *Husky Ventures*, 911 F.3d at 1011.

Because injunctive relief is equitable in nature, the weighing of these factors necessarily involves an exercise of judicial discretion. See *Friess v. Quest Cherokee, L.L.C.*, 42 Kan. App. 2d 60, 63, 209 P.3d 722 (2009). Appellate courts review the grant or denial of injunctive relief for an abuse of discretion. *Downtown Bar and Grill*, 294 Kan. at 191. The scope of that discretion varies, however, based on the contours of the issues presented to the district court. A district court has no discretion to make errors of law; we exercise unlimited review over a court's legal conclusions. See *Brown v. ConocoPhillips Pipeline Co.*, 47 Kan. App. 2d 26, 36, 271 P.3d 1269 (2012). Similarly, to the extent a court's analysis rests on factual findings, we review those findings to determine whether they are based on substantial competent evidence and are sufficient to support the district court's conclusions of law. 47 Kan. App. 2d at 32.

For the reasons we explain below, we agree that neither of these Acts provides a right for Roll to refuse community-based treatment and insist on receiving institutional care when medical professionals have concluded such community-based treatment is appropriate. Because Roll cannot succeed on the merits of her claims, the district court did not err when it denied her request for a permanent injunction. See *Wolfe Elec.*, 293 Kan. at 411.

2.1. *There is no right under the ADA or its regulations for a person to demand institutional treatment when more integrated, community-based services are adequate to address his or her treatment needs.*

The ADA was enacted by Congress in 1990 to diminish discrimination against persons with disabilities. Though federal law had attempted to tackle this issue in the past in various ways, for the first time, the ADA sought to address, among other forms of unfair treatment, discrimination that arose from institutionalization and segregation of people with disabilities. See *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 n.1, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999). In the ADA's general findings, Congress recognized that society has historically "tended to isolate and segregate individuals with disabilities, and . . . such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2) (2018). Congress noted that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization." 42 U.S.C. § 12101(a)(3). And "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion [and] segregation." 42 U.S.C. § 12101(a)(5).

Title II of the ADA governs state and other public entities that provide public accommodations and services. Relevant here, Title II of the ADA states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2018).

This statute is implemented, in part, through 28 C.F.R. § 35.130 (2019). See 42 U.S.C. § 12134(a) (2018) (attorney general to promulgate regulations to implement Title II's directives). The first section of that regulation essentially incorporates the ADA's language, stating again that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.130(a). The regulation goes on to provide multiple examples of unlawful discrimination, including "[d]eny[ing] a qualified individual with a disability the opportunity to participate in or benefit from [the public entity's] aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i).

Consistent with the general findings of Congress articulated in the ADA itself, the regulation directs that a public entity "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). At the same time, however, "[n]othing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept." C.F.R. § 35.130(e)(1); see 42 U.S.C. § 12201(d).

Roll argues that these statutory and regulatory provisions—either individually or in combination, as they were interpreted and applied by the Supreme Court in *Olmstead*—establish a right for Roll to refuse transfer to a community-based setting and remain at Parsons. The interpretation of the ADA and its regulations is a question of law we review de novo. See *State v. Keel*, 302 Kan. 560, Syl. ¶ 4, 357 P.3d 251 (2015).

When interpreting statutes, our primary aim is to determine the intent of the body enacting the legislation (here, Congress). 302 Kan. 560, Syl. ¶ 5. We look to the plain language of the statute or regulation in question, giving common words their ordinary meanings. 302 Kan. 560, Syl. ¶ 6. But this analysis does not occur in isolation. Rather, courts must consider the various provisions of an act in context—*in pari materia*—and seek to reconcile those provisions into workable harmony. *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1123, 307 P.3d 1255 (2013).

20

In *Olmstead*, the Supreme Court interpreted these same provisions when considering whether Title II of the ADA required placement of certain individuals with mental disabilities in community-based treatment programs instead of institutions. *Olmstead* involved two women with mental disabilities and mental illnesses who were admitted to and received treatment in the psychiatric unit of a Georgia state hospital. After their conditions stabilized, both women sought—and their doctors recommended—treatment in a community-based program. When the hospital declined to release them, the women sued, arguing their continued confinement despite the doctors' recommendations violated Title II of the ADA.

After considering both the ADA and its regulations, *Olmstead* held that unjustified segregation in an institution constitutes discrimination under Title II. 527 U.S. at 597. The Court observed that the congressional findings in the ADA relating to institutionalization and segregation reflect an understanding that institutionalization severely restricts a person's daily life activities. And the institutionalization of individuals who can function in a community-based environment perpetuates a stereotype that such individuals should not be in the community. 527 U.S. at 600-01.

To determine whether unjustified discrimination—and thus a violation of the ADA—exists, the Court established a three-pronged test: A public entity has the duty to move patients from an institutional setting to a community-based setting when (1) "[its] treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 607.

The first prong in this analysis, whether community-based treatment is appropriate, establishes whether a placement potentially constitutes discrimination by comparing the individual's treatment needs with the appropriateness of more integrated

21

alternatives. To make this determination, the State or other public entity "may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." 527 U.S. at 602. Without a determination that community-based treatment is appropriate, *Olmstead* observed that "it would be inappropriate to remove a patient from the more restrictive setting." 527 U.S. at 602.

As a result of this qualification prong, public entities have an ongoing duty under the ADA to assess whether an individual's treatment can be met in a more integrated (or less restrictive) environment. See *Messier v. Southbury Training School*, 562 F. Supp. 2d 294, 337-38 (D. Conn. 2008) (to comply with the integration mandate, institutions cannot wait until a patient requests a transfer to determine whether that patient's needs could be met in a more integrated setting). This analysis also seeks to ensure that people who need institutional care are not denied those services—"nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Olmstead*, 527 U.S. at 601-02.

The second and third prongs of the *Olmstead* test create exceptions to excuse otherwise discriminatory acts—that is, they establish when discriminatory segregation does not violate Title II. Under the second prong, a patient may consent to ongoing segregation (by opposing transfer), giving up his or her ability to challenge that action. See Schwartz et al., *Realizing the Promise of* Olmstead*: Ensuring the Informed Choice of Institutionalized Individuals with Disabilities to Receive Services in the Most Integrated Setting*, 40 J. Legal Med. 63, 83-85 (May 2020). In explaining the role of a person's consent, the *Olmstead* Court noted that federal law does not *require* "that community-based treatment be imposed on patients who do not desire it." 527 U.S. at 602 (citing 28 C.F.R. § 35.130[e][1]). Thus, the ADA does not *require* a public entity to transfer a person from an institution to a community-based program if the person wishes to remain at the institution. Instead, a disabled person can consent to a government's discriminatory

practice, excusing an otherwise actionable violation. And the third prong gives the public entity an affirmative defense even when the patient either desires or does not oppose placement in a more integrated environment to explain why a more integrated placement cannot be accommodated under the particular facts presented.

Turning to the case before us, Roll argues that even if community-based treatment were appropriate in her case—a finding supported by substantial competent evidence in the record—*Olmstead*'s second prong is not merely a caveat to the ADA's anti-discrimination provisions. Rather, she asserts, *Olmstead* recognized a disabled person's affirmative right under the ADA to refuse community-based services and insist on continued institutional treatment. We disagree for several reasons.

*First*, the Department's proposed transfer from Parsons to a community-based treatment setting does not fall within the scope of governmental discrimination proscribed by the ADA. The ADA defines discrimination as, among other things, unjustified segregation (including institutionalization) of disabled persons from the greater community. See 42 U.S.C. § 12101(a)(2), (3), (5). Had the Department insisted that Roll remain at Parsons, as the Georgia hospital did in *Olmstead*, such a directive would be prima facie evidence of discrimination under the ADA because it would have excluded her from participating in a more integrated program for which she was qualified. See 42 U.S.C. § 12132; *Olmstead*, 527 U.S. at 607. Here, however, we are presented with the factual inverse of *Olmstead*; it is the Department that seeks to transfer Roll to an appropriate and more integrated—that is, less discriminatory—environment while Roll (and her guardians) oppose the transfer. The Department has not proposed a discriminatory act that triggers the ADA's protections.

*Second*, nothing in the language of the ADA or its regulations establishes a right for a person to demand more restrictive treatment (i.e. greater discrimination) than what is appropriate for his or her treatment. *Olmstead* recognizes that a person may agree to

23

remain in an institutionalized setting, thereby giving up the right to challenge a State's discriminatory actions. This recognition does not establish an affirmative right to demand more extensive and restrictive treatment than is medically necessary.

Rather, the ADA's implementing regulations underscore that a public entity must provide the option of an accommodation commensurate with the person's disability. See 28 C.F.R. § 35.130(b)(1)(i). As a person's need increases, the services the State offers must also increase and be commensurate to the aid provided others. See 28 C.F.R. § 35.130(b)(1)(i)-(iii). If the person's needs diminish, the State may choose to provide care beyond the level required. See 28 C.F.R. § 35.130(c). But nothing in the ADA or its regulations imposes an obligation on the public entity to provide the level of aid the person previously required or came to expect. Indeed, such a provision would contradict Congress' aim in enacting the ADA—discouraging discrimination against those with mental disabilities through needless segregation from their communities. Accord *Friends of Bethany Place*, 297 Kan. at 1123 (statutory provisions should be read in harmony to effect legislative objectives).

*Third*, though 28 C.F.R. § 35.130(e)(1) recognizes that individuals do not have to accept a government service for which they are qualified, they must still be that— "qualified." See 28 C.F.R. § 35.130(b)(1)(i). In other words, the ADA does not require a person to accept government services and treatment, even when that treatment is appropriate. But the ADA cannot be used to justify a demand for treatment beyond that which is appropriate for a person's condition.

Indeed, Roll's argument as to *Olmstead*'s second prong cannot be reconciled with the Court's holding in that case. *Olmstead*'s focus was on an institution's compliance with the ADA. An institution does not violate Title II, and is not required to transfer a patient, when a patient consents to remain in a less integrated environment. It does not follow that

a person has the right to choose to remain at an institution regardless of his or her medical needs, or that an institution lacks the power to move a person who does not consent.

The cases Roll cites in her brief do not lead us to a different conclusion. For example, *Jensen v. Minnesota Department of Human Services*, 138 F. Supp. 3d 1068 (D. Minn. 2015), involved a class action alleging Minnesota had not been providing treatment for individuals with mental-health conditions in the most integrated setting, in violation of *Olmstead*. As part of a settlement agreement, the State adopted an "*Olmstead* Plan" outlining steps for greater integration in community programs. In approving the plan, the court noted that "the *Olmstead* decision is not about forcing integration upon individuals who choose otherwise," and the goal of "placing individuals with disabilities in the most integrated setting must be balanced against what is appropriate and desirable *for the individual*." *Jensen*, 138 F. Supp. 3d at 1075. Thus, *Jensen* recognizes, like the ADA and *Olmstead*, that the appropriateness of more integrated treatment requires an individualized analysis for each person receiving treatment. This does not mean, however, that a State must always provide more segregated treatment than is appropriate or necessary at a patient's request. See also *Joseph S. v. Hogan*, 561 F. Supp. 2d 280 (E.D.N.Y. 2008) (denying motion to dismiss plaintiff class' claims that New York was essentially warehousing individuals with mental-health conditions in nursing homes instead of seeking more integrated and effective community-based treatment). But see *In re Easly*, 771 A.2d 844, 851-52 (Pa. Cmwlth. Ct. 2001) (concluding, in a divided opinion, that *Olmstead*'s second prong implied a right to insist on continued institutionalization).

*Fourth*, we disagree with Roll's argument on appeal that the district court erred when it repeatedly described the ADA's integration requirement as requiring placement in the "least restrictive setting" (rather than the "most integrated setting") appropriate. While the ADA requires placement in the "most integrated setting," the district court often used the phrase "least restrictive setting" to describe community-based programs—a phrase that arises out of Kansas guardianship law. Our review of the district court's discussion

demonstrates the court understood that the relevant focus of the ADA and *Olmstead* was to integrate individuals with mental-health conditions in their communities to the greatest extent possible and appropriate. The variation between the terminology the court employed and the language used in the ADA, in this instance, is a distinction without a difference. Accord *Olmstead*, 527 U.S. at 602 (contrasting community-based treatment with "the more restrictive setting" of institutionalization).

The second prong of the *Olmstead* analysis cannot be divorced from the Court's holding in that case. If a patient opposes receiving treatment in a more integrated environment, as Roll has here, the ADA does not *require* integration. But a person's opposition does not deprive the institution of the power to place a person into a more integrated environment. See Bagenstos, *Taking Choice Seriously in* Olmstead *Jurisprudence*, 40 J. Legal Med. 5, 7-9 (May 2020) (explaining *Olmstead* is about integration, comparing its integration requirement to *Brown v. Board of Education*, and noting federal court decisions that rejected objections by patients who wished to remain in a more segregated environment); Note, *Integration as Discrimination Against People with Disabilities?* Olmstead*'s Test Shouldn't Work Both Ways*, 46 Cal. W. L. Rev. 177, 189-91 (2009) (discussing the basis of the "do not oppose" provision, 28 C.F.R. § 35.130[e][1]).

The ADA may excuse a person's institutionalization by a government entity, even if he or she could be appropriately treated in a community setting, if the person consents to his or her continued segregation. But it does not prohibit the government from placing that person in an appropriate community-based treatment program. The Department has chosen to transfer Roll to a community placement. The district court correctly concluded that neither the ADA, its regulations, nor the Supreme Court's decision in *Olmstead* establish a right to remain at Parsons when community-based treatment is appropriate.

2.2. *The Social Security Act's "freedom of choice" provision does not establish a right to choose more segregated treatment than what is appropriate.*

After the trial, the court allowed Roll to add a claim, pursuant to 42 U.S.C. § 1983, for a violation of § 1915 of the Social Security Act, traditionally referenced as Medicaid's "freedom of choice" provision. This statute involves Medicaid waivers, which allow the federal government to waive rules that usually apply to the Medicaid program. Under a waiver, states can provide services to their residents that normally would not be covered by Medicaid. For example, a waiver would allow Medicaid funds to be spent on in-home care for people who otherwise would have to go into long-term institutional care. The "freedom of choice" provision cited by Roll requires a State, in order to receive federal Medicaid funding, to provide an assurance that

> "individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the [Medicaid] waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded." 42 U.S.C. § 1396n(c)(2)(C).

The SSA's accompanying regulations authorize a state to obtain a Medicaid waiver that provides funding for home and community-based services (HCBS)—not merely hospital-based services—if it agrees to provide a person

> "[a]ssurance that when a beneficiary is determined to be likely to require the level of care provided in a hospital, NF [nursing facility], or ICF/IID [intermediate care facilities for individuals with intellectual disabilities], the beneficiary or his or her legal representative will be—
> "(1) Informed of any feasible alternatives available under the waiver; and
> "(2) Given the choice of either institutional or home and community-based services."
> 42 C.F.R. § 441.302(d) (2019).

Roll alleges that since she is qualified to remain at Parsons (in that her mental-health conditions fall within the hospital's broader treatment mission), these provisions of the SSA indicate that she has the option to stay there—to choose "either institutional or home and community-based services." The district court did not analyze whether Parsons' proposed transfer without Roll's consent violated these provisions; it simply noted the Kansas Medicaid plan contains this assurance and summarily ruled that the proposed transfer did not violate these provisions.

As a preliminary matter, the Department argues that Roll does not have standing to bring this claim, as federal law does not recognize a private right of action under Medicaid's "freedom of choice" provisions. Under 42 U.S.C. § 1983, a person deprived of "any rights, privileges, or immunities secured by the Constitution and laws" may sue to vindicate the deprivation of those rights. Section 1983 does not create independent rights, however; instead, it provides a procedural vehicle—a remedy—through which a person may vindicate rights secured elsewhere. *Gonzaga University v. Doe*, 536 U.S. 273, 284, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). Since most statutes do not contain such a remedy, claims are often brought under § 1983. See *Blessing v. Freestone*, 520 U.S. 329, 347, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997). But before proceeding under § 1983, a person must demonstrate a law provides an individual right to sue.

Courts apply a two-part, burden-shifting test when determining whether a federal law creates a right enforceable under § 1983. The plaintiff bears the initial burden to demonstrate a law creates an enforceable right by establishing three factors. First, Congress must have intended the provision to benefit the plaintiff. Second, the right cannot be so "'vague and amorphous'" that it would be difficult for courts to enforce. 520 U.S. at 340. And third, the statute "must unambiguously impose a binding obligation on the States." 520 U.S. at 341. Meeting these three factors creates a presumption of enforceability. The burden then shifts to the State to rebut that presumption by demonstrating a congressional intent to foreclose § 1983 enforcement. 520 U.S. at 341.

Only rights are enforceable under § 1983, not benefits or interests. *Gonzaga University*, 536 U.S. at 283. To determine whether an individual right exists, courts examine whether Congress used rights-creating language. 536 U.S. at 284; *Alexander v. Sandoval*, 532 U.S. 275, 288-89, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001). For example, statutes that focus on the entities regulated rather than the individuals protected are generally insufficient to create an individual right. 532 U.S. at 289. Similarly, statutes that focus on the administration of a system instead of on the individuals in that system also indicate that Congress did not intend to create a right. See *Blessing*, 520 U.S. at 343.

Several courts across the country have analyzed Medicaid's "freedom of choice" provision in 42 U.S.C. § 1396n(c)(2)(C) and found that it provides a private right enforceable under § 1983. See *Ball v. Rodgers*, 492 F.3d 1094, 1117 (9th Cir. 2007); *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 683-84 (S.D. Ohio 2017); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1014-15 (D. Minn. 2016); *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 768-69 (E.D. Ky. 2005); *Waskul v. Washtenaw County Community Mental Health*, No. 16-10936, 2019 WL 1281957, at *5 (E.D. Mich. 2019) (unpublished opinion); *Illinois League of Advocates for the Developmentally Disabled v. Quinn*, No. 13 C 1300, 2013 WL 5548929, at *9 (N.D. Ill. 2013) (unpublished opinion); *Zatuchni v. Richman*, No. 07-CV-4600, 2008 WL 3408554, at *10 (E.D. Pa. 2008) (unpublished opinion). At least one court, after squarely considering the question on the merits, has held that no right exists. See *M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (provision lacks sufficient rights-creating language, turning largely on pre-Affordable Care Act Spending Clause jurisprudence).

The Ninth Circuit's decision in *Ball*, which provides the most thorough post-*Gonzaga* discussion of whether § 1396n(c)(2)(C) confers an individual right, concluded that it does. See *Ball*, 492 F.3d at 1119-20. The court devoted most of its analysis to the first factor—whether Congress intended to create an individual right—and found several

indicia that Congress intended that result. 492 F.3d at 1106-15. For example, the provision's language refers to individuals and their need to both be informed of and choose a less restrictive environment; it addresses the needs of specific individuals, not the needs of the aggregate. 492 F.3d at 1107. The court likewise found the provision uses rights-creating language. 492 F.3d at 1108-11. And surrounding statutes, agency regulations, and legislative history also indicate a legislative intent to create an individual right to effectuate a person's choice of treatment facility. 492 F.3d at 1112-15.

We find this analysis persuasive and agree with the majority of courts that have considered the question whether § 1396n(c)(2)(C) creates an individual right that can be enforced under § 1983. As *Ball* noted, rights to participate in appropriate treatment choices are not vague or amorphous. A court can determine compliance based on a state's Medicaid plan, state records, and patient and provider testimony. 492 F.3d at 1115. The provision imposes an obligation on the State to inform patients of options, meeting the third factor. 492 F.3d at 1116. And the SSA does not express a legislative intent to prohibit a claim through § 1983 or to provide an alternative remedy. 492 F.3d at 1116-17.

The Department's other arguments as to why we should not proceed to consider the merits of Roll's claim under the SSA are similarly unconvincing. It is true, as the Department points out, that the merits of this claim were not meaningfully discussed in the district court's opinion. But the record here is sufficient to allow us to address this claim, which turns largely on legal questions: the interpretation of Medicaid statutes and their implementing regulations.

The relevant Medicaid statute provides that persons who are "determined to be likely to require the level of care provided in a hospital" must be "informed of . . . feasible alternatives [to] inpatient hospital services." 42 U.S.C. § 1396n(c)(2)(C). And those individuals must be "[g]iven the choice of either institutional or home and community-based services." 42 C.F.R. § 441.302(d)(2). This choice only arises, however,

when a court has determined someone is "likely to require the level of care provided in" one of the facilities listed in the statute. 42 U.S.C. § 1396n(c)(2)(C).

The district court concluded that community-based treatment was appropriate for Roll's needs. In other words, Roll does not *require* an institutionalized level of care. Indeed, for several years, Parsons medical personnel have believed Roll could function well in a community environment, though the hospital has previously allowed Roll to remain given her guardians' opposition. Contrary to Roll's arguments on appeal, the choice afforded by the Medicaid waiver program is not unlimited. As with Roll's claims under the ADA, Roll's choice of treatment options only extends to those options appropriate for her medical needs. Because the court found that Roll does not require institutionalized care, the Department had no obligation to let her choose to stay in an institutional setting. Thus, Roll cannot succeed on her § 1983 claim under the SSA.

Roll cannot prevail on the merits of her claims under the ADA or the SSA. Without succeeding on the merits, a "permanent injunction simply cannot stand as a matter of law." *Wolfe Electric*, 293 Kan. at 411. The district court did not abuse its discretion when it denied the permanent injunction.

3.    *Roll's remaining arguments do not change these conclusions.*

Roll's brief asserts several other challenges relating to the district court's factual findings and statements in its journal entry, as well as various procedural claims regarding the court's pretrial denial of her motion for summary judgment. But these claims do not alter this court's conclusion that Roll cannot succeed, as a matter of law, on her claims under the ADA and SSA.

For example, Roll challenges two references in the district court's journal entry indicating that Roll herself desired to move to a community setting (instead of Parsons).

As background, Roll did not testify at the trial. But during the trial, Roll's attorney asked a Parsons administrator to talk with Roll off the record and ask whether she wanted to live in the community or at Parsons. The court agreed to allow the parties to proceed in this matter, stating it would take Roll's mental condition into consideration when evaluating what the administrator reported back. Based on the administrator's conversation with Roll, Roll appears to have answered "yes" when asked if she wanted to live in a community placement. Though multiple witnesses testified that Roll enjoys the community outings arranged by Parsons for its residents, the record includes no other evidence that Roll wished to move to a community-based facility. Yet the court found that Roll desired the transfer.

We, like Roll, question whether this finding regarding Roll's desire is supported by substantial competent evidence. We do not believe the summary of a brief extrajudicial, out-of-court conversation between the Parsons administrator and Roll constitutes "'a substantial basis of fact'" as to Roll's desires, particularly given Roll's intellectual and mental-health condition. *Wiles*, 302 Kan. at 73. But as we have discussed previously, neither the ADA nor the SSA provide an unqualified right to remain at a mental-health institution if Roll's needs can be appropriately addressed in a community-based setting. Thus, the question of whether Roll (or her guardians) consented to the proposed transfer is a red herring. Instead, the controlling question is whether a community-based program is an appropriate treatment setting.

Likewise, because Roll has not succeeded on her claims under the ADA or the SSA, the district court did not err when it denied her request for attorney fees. See 42 U.S.C. § 12205 (2018); 42 U.S.C. § 1988(b) (2018) (both allowing the district court discretion to award reasonable attorney fees to the prevailing party). And though Roll has again requested attorney fees on appeal, that request is similarly denied. See Supreme Court Rule 7.07(b) (2020 Kan. S. Ct. R. 50) (appellate court may award attorney fees when those fees were available before the district court).

Finally, in light of our decision affirming the denial of the permanent injunction after a trial on the merits, we need not address Roll's claims that the court should have granted her previous motion for summary judgment or that the court's journal entry unnecessarily addressed a claim Roll had previously withdrawn. See *Evergreen Recycle v. Indiana Lumbermens Mut. Ins. Co.*, 51 Kan. App. 2d 459, 490, 350 P.3d 1091 (2015).

Before concluding, we pause to reflect on the scope of today's decision. The question presented in Roll's petition was whether, under the ADA or SSA, her consent (or her guardians' consent) is required before the Department or Parsons could transfer her to an appropriate community-based treatment program. We find that it is not.

At this point, the parties have not identified which community-based program Roll will be joining. The district court made no finding that any specific program was adequate to address Roll's needs, noting instead that the next step going forward—now that these threshold legal questions have been resolved—is for the parties to select a program for Roll (or, in the case of Roll and her guardians, to determine whether they would prefer to decline assistance and have Roll discharged).

Our decision today does not and cannot address these remaining practical questions—questions that were beyond the scope of Roll's petition. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 890-91, 179 P.3d 366 (2008) (Kansas courts do not have jurisdiction to issue advisory opinions.). We hold only that the ADA and SSA do not require Roll's consent before she is transferred from Parsons to an appropriate community-based treatment program. Thus, the district court correctly denied a permanent injunction.

Affirmed.