IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,447

CATHERINE ROLL, a Disabled Person,
by and Through Her Co-guardians
TERESA ROLL KERWICK and MARY ANN BURNS,
*Appellant*,

v.

LAURA HOWARD, Secretary of the Kansas
Department for Aging and Disability Services,
and MIKE DIXON, Superintendent of the Parsons
State Hospital and Training Center,
*Appellees*.

SYLLABUS BY THE COURT

1.

A case is moot when it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.

2.

In order to be entitled to an award of costs and fees under 42 U.S.C. § 1988(b) (2018), a party must demonstrate they are the prevailing party.

3.

A "prevailing party" is the party that has been awarded some relief by the court on the merits of at least some of the claims. Generally, when a case is dismissed as moot without a judgment by the court on the merits of any of the claims or a court-ordered consent decree, there is no prevailing party entitled to an award of attorney fees even though a party may have achieved the desired result of the litigation.

1

Review of the judgment of the Court of Appeals in 59 Kan. App. 2d 161, 480 P.3d 192 (2020). Appeal from Sedgwick District Court; FAITH A.J. MAUGHAN, judge. Opinion filed August 12, 2022. Appeal dismissed.

*David P. Calvert,* of David P. Calvert, P.A., of Wichita, and *Stephen M. Kerwick,* of Wichita, argued the cause and were on the briefs for appellant.

*Arthur S. Chalmers*, assistant attorney general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the briefs for appellee.

PER CURIAM:  The defendants sought to relocate Catherine Roll, an individual with significant mental and physical disabilities, from the Parsons State Hospital and Training Center (Hospital), where she has been a long-term resident, to a community-based treatment center. Roll, through her guardians, resisted such a transfer and contended that the Americans with Disabilities Act (ADA) and the Social Security Act (SSA) prohibited the defendants from changing her placement without her approval. The district court held that she did not have a statutory right to remain at the Hospital. The Court of Appeals affirmed that order, and we granted review.

We dismiss the appeal as moot. But in order to explain this determination, we find it necessary to recount the long and convoluted course the litigation in this case has taken.

Catherine Roll was born in 1955. She has had developmental delays since infancy and developed schizophrenia as a teenager. She was in mainstream public schooling into second grade, when she was transferred to parochial schooling specializing in children with intellectual and developmental disabilities. She was eventually placed in the Larned State Hospital for a short time and then, in 1970, transferred to Parsons State Hospital. She has been on a long-term regimen of psychotropic medication to treat her schizophrenia.

Roll had a generally successful experience at the Hospital, recently achieving 96 percent of her treatment objectives. She also appeared to be happy and comfortable at the Hospital. She would go out into the community with escorts approximately eight times a month, including trips to Walmart, manicures, and baseball games. Roll had some work duties at the Hospital, including tasks such as folding and shredding papers and delivering things to staff members. She received physical therapy for an ankle injury and other conditions.

Roll's parents died in the late 1990s. Teresa Kerwick and Mary Ann Burns are Roll's sisters, and they became her co-guardians in 2002.

In the spring of 2016, Hospital staff contacted Teresa and told her the Hospital had to cut approximately 1.3 million dollars from its operating budget, and Roll was a good candidate for transfer from the facility. On June 8, 2016, Teresa received a letter informing her that she needed to find a community care institution or Roll would be discharged to the guardians' homes. Believing that community-based residential centers would provide less desirable services for Roll and that she benefited from the long-term relationship she had with the Hospital staff and her familiarity with the campus, the guardians ultimately rejected voluntary transfer to another facility.

On August 19, 2016, Kerwick and Burns filed a petition seeking injunctive relief and an application for a temporary restraining order seeking to prevent the defendants from discharging Roll to community services or the petitioners' homes. The original petition included only a claim that the defendants' conduct violated the ADA with an accompanying claim of a civil rights violation under 42 U.S.C. § 1983 (2018). On the same day, the district court granted an ex-parte order temporarily restraining the defendants from discharging Roll from Parsons State Hospital and Training Center. The record does not reflect that the temporary restraining order was ever converted to a

separate preliminary injunction, but the order remained in effect while the case was pending in district court.

The court granted a motion by the defendants for the appointment of a guardian ad litem to represent Roll's interests. The guardian examined a multitude of documents, including social worker assessments, psychological evaluations, and case notes, and submitted a letter to the district court. The letter noted Roll's numerous special needs, the manner in which the Hospital was meeting those needs, and the difficulty in finding an adequate substitute for the care she was receiving. It recommended retaining Roll at the Hospital. At the defendants' request, the guardian ad litem then carried out in-person interviews with Roll, the Hospital staff, and representatives of community treatment facilities, and issued a follow-up letter modifying his recommendation to include the possibility of relocation to a community-based center and noting advantages to both the Hospital and the community facilities.

Roll filed a motion for summary judgment. Following multiple responses and replies, the district court denied the motion, determining that genuine issues of material fact precluded summary judgment, and the case went to a bench trial.

Many of the witnesses were current or former Hospital staff who generally testified that Roll was in active treatment, was highly successful in responding to her treatment, did not exhibit aggressive or psychotic behavior, and was pleasant and compliant. The staff members also testified that, in their opinion, Roll would do well in a community-based program. The guardians testified about their personal experiences with Roll and explained why they did not consider any of the community-based centers suitable for placement.

After the trial, the district court granted the guardians permission to add a claim under the SSA that the proposed transfer from the Hospital violated Roll's right to choose

4

which facility would provide her treatment. The parties submitted proposed findings of fact and conclusions of law, as well as trial briefs on the ADA and SSA claims.

On May 23, 2019, the district court entered judgment in favor of the defendants with a 69-page journal entry including extensive findings of fact and conclusions of law. Based on the evidence presented at trial, the district court found that treatment available at a community-based program was appropriate to meet Roll's needs and that the Hospital provided a level of care and restrictions beyond what was medically necessary for Roll. In rejecting the ADA and SSA claims, the district court explained:

> "There is no discrimination in the agency action initiated by Parsons State Hospital. Ms. Roll's treatment team has assessed her needs and abilities. A determination has been made that Ms. Roll is capable of living independently in a community based environment with the assistance of community service providers. This does not constitute an act of discrimination entitling Plaintiffs to injunctive relief.
> . . . .
> " . . . Ms. Roll's Social Work Assessment Annual Reviews, Psychological Annual Reviews, and Individual Program Plans from 2010 through 2017 supports good cause for her discharge. This documentation collectively speaks to the very issue of the adaptive living skills Ms. Roll has developed over time which make her appropriate for placement in a less restrictive living environment. This documentation, in conjunction with testimony offered by staff of Parsons State Hospital, provides evidence to the Court of her desire to partake in community based activities, her ability to work and earn wages, her ability to take care of her own hygiene needs, her ability to dress herself, her ability to exercise choices about daily living, her ability to perform various tasks to include setting a table, maintaining her bedroom, assisting with sweeping and mopping, doing art projects, working on puzzles, shopping, going out to eat, attending church, partaking in religious studies, reading her bible, reading magazines or the newspaper and communicating her wants, needs and desires."

Roll took a timely appeal to the Kansas Court of Appeals, and the district court granted Roll a stay of the effect of the judgment pending appellate resolution, effectively

keeping the temporary restraining order in place. The Court of Appeals affirmed in *Roll v. Howard*, 59 Kan. App. 2d 161, 480 P.3d 192 (2020). The intermediate appellate court summarized its ruling in the opinion's introduction:

"Catherine Roll is a patient at Parsons State Hospital, where she has lived and been treated for an intellectual disability and schizophrenia for several decades. In 2016, the Department for Aging and Disability Services, in conjunction with Parsons, indicated an intent to transfer Roll to a more integrated community-based treatment program (though the specific program where she would be transferred was not yet determined). Roll's guardians sought a permanent injunction to prevent the transfer, alleging the Americans with Disabilities Act (ADA) and the Social Security Act (SSA) prevented the Department from transferring her without her consent.

"After a trial, the district court found that the Department had shown that the treatment available at a community-based program was appropriate to meet Roll's needs. The court also found that, because Parsons provided a level of care and restriction beyond what was medically necessary, neither the ADA nor the SSA prevented the State from transferring her to a different program. After carefully reviewing the record and the parties' arguments, we find the district court's crucial finding—that Roll does not need to be treated in a facility as restrictive as Parsons—is supported by the record. And we agree that there is no right under the ADA and SSA for patients to remain at a more restrictive facility if the level of care provided is medically unnecessary. Thus, we affirm the district court's denial of the permanent injunction." 59 Kan. App. 2d at 163-64.

On March 25, 2021, this court granted Roll's petition for review. She filed a supplemental brief on April 28, 2021, and this court heard oral argument on September 15.

Then, about a week after oral argument, on September 24, the defendants filed a Notice of Change of Circumstances and Motion for Dismissal in which they asserted that Roll's physical and mental health had suffered a significant decline and the defendants no longer considered community-based treatment an option. The notice stated, in part:

"8. However, Ms. Roll's medical and mental health conditions and her associated treatment needs have changed. The PSH [Parsons State Hospital] professionals, familiar with Ms. Roll's needs and capabilities, have now determined that community placement is not appropriate. They believe that she should receive her care and treatment at PSH.

"9. In later January 2021, Ms. Roll was diagnosed with an intracranial atherosclerosis, commonly referred to as hardening of the arteries in the brain. As late as March 2021, PSH's professionals did not believe this condition required her continued residence and treatment at PSH.

"10. Yet, the condition has worsened. Ms. Roll's behaviors, needs and abilities are now such that Ms. Roll cannot be cared for and treated in community placement. She needs the care and treatment provided by PSH.

"11. Ms. Roll's deteriorating condition is progressive and, at best, it will not improve for community placement to ever be an appropriate option for her.

"12. Whether this Court were to reverse or affirm the decisions of the Court of Appeals and trial court, the defendants will not transfer Ms. Roll to a community-based treatment program or away from PSH."

In light of these alleged changed circumstances, the defendants moved to dismiss the appeal as moot. They further asked the court to vacate both the district court and Court of Appeals judgments.

On September 29, contending she had prevailed in the litigation, Roll filed a motion for attorney fees totaling $143,290 and for costs totaling $8,345.80. The defendants filed a response opposing the motion for monetary award, arguing that neither party prevailed because the entire case had become moot. On October 20, Roll filed a response to the motion to dismiss and a separate motion requesting an additional $17,640 in fees generated preparing the response. In the response, the guardians alleged that the Hospital knew about Roll's deteriorating medical condition for many months. The guardians asserted that on December 16, 2020, they received "the first of many emails"

7

from a social worker at the Hospital documenting the decline of Roll's condition. They claimed the case was not moot and that exceptions to the mootness doctrine applied.

On December 3, this court ordered the parties to engage in mediation. The court directed the parties to address issues including the extent and permanency of Roll's changed circumstances, when the defendants knew or should have known about the changes in her condition, and what effect those changes had on the parties' respective positions in the appeal.

A mediation session took place on March 4, 2022 and lasted about 3 1/2 hours. On April 4, the parties filed a joint statement informing the court they had reached no settlement and were unable to agree on disputed facts.

*Discussion*

In September 2021, before this court reached a decision on the merits, the defendants informed this court they no longer were seeking to transfer Roll and they intended to maintain her residence at the Hospital. Based on substantial changes in Roll's medical condition after the district court's factual findings and legal conclusions, the defendants voluntarily provided the plaintiff with the relief she has been seeking through litigation for the past six years. This court can offer the plaintiff no further relief than what she has already received.

A case is moot when a court determines that "'it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.'" *State v. Roat*, 311 Kan. 581, 584, 466 P.3d 439 (2020) (quoting *State v. Montgomery*, 295 Kan. 837, 840-41, 286 P.3d 866 [2012]).

8

Here, due to Roll's declining condition, the defendants no longer oppose Roll's request to remain at the Hospital. The parties are therefore in agreement, and this court can enter no ruling that would affect the contested issue. "When, by reason of changed circumstances between commencement of an action and judgment on that action, a judgment would be unavailing as to the issue presented, the case is moot. [Citation omitted.]" *Roat*, 311 Kan. at 596.

Courts have a duty to decide actual controversies by judgments that can be given an effect and not to give opinions on abstract propositions. Mere "rightness" does not suffice to justify the continued exercise of authority over an appeal. *Roat*, 311 Kan. at 599. Were this court to rule either in favor of the defendants or in favor of Roll, the judgment would have no effect on her long-term placement. The defendants have represented in a written notice filed with this court that Roll's deteriorating condition is progressive and "it will not improve for community placement to *ever* be an appropriate option for her." (Emphasis added.) She will continue to reside at the Hospital either way that this court might rule, which is precisely what she sought in her petition.

The entire premise of the district court's ruling was its factual findings that treatment available at a community-based program was appropriate to meet Roll's needs and that the Hospital provided a level of care and restrictions beyond what was medically necessary for Roll. The facts and evidence that supported these findings has now completely changed—in fact, the opposite is true. Although a factual dispute may exist between the parties as to *when* Roll's medical condition began to decline, there appears to be no dispute that her condition substantially worsened after the district court made its factual findings and denied the plaintiff's request for an injunction. The injunctive relief being sought by the plaintiff is no longer necessary or required, and we decline to review the case simply to determine whether the lower courts, at their discretion, could have awarded attorney fees to the plaintiff based on her statutory claims.

9

Roll urges application of an exception to the mootness doctrine that allows a court to decide cases "capable of repetition, yet evading review." See, e.g., *Roat*, 311 Kan. at 590. We are not persuaded that the circumstances of this case and the issues it presents are of such a nature that they are likely to be repeated in future litigation. Furthermore, although review was ultimately precluded under the peculiar facts of this case, we consider it likely that similar issues, should they arise, will be susceptible to appellate review. After all, this case was reviewed by the Court of Appeals, and it was only Roll's changed circumstances that led us to dismiss the appeal after we granted review.

We therefore apply Supreme Court Rule 8.03(j)(6) (2022 Kan. S. Ct. R. at 54) and dismiss the appeal as moot. In dismissing the appeal at this stage, we take no position on the correctness of the opinions of the courts below and we caution against relying on the decision of the Court of Appeals for precedential value. See Rule 8.03(h) and (k)(2).

Roll has requested a substantial award of costs and attorney fees from this court based on her statutory claims. See 42 U.S.C. § 12205 (2018); 42 U.S.C. § 1988(b) (2018) (both statutes provide that the court, in its discretion, may allow the "prevailing party" reasonable attorney fees and costs). Is Roll the prevailing party in this case?

The United States Supreme Court set out the general standard governing the prevailing-party determination in *Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 109 S. Ct. 1486, 103 L. Ed. 2d 866 (1989): "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." 489 U.S. at 792-93. The Court explained that a material alteration in the parties' legal relationship occurs when "the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" 489 U.S. at 791-92. This standard requires that "'a plaintiff receive at least some relief on the

10

merits of his claim before he can be said to prevail.'" 489 U.S. at 792 (quoting *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S. Ct. 2672, 96 L. Ed. 2d 654 [1987]).

In *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dept. of Health & Human Res.*, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001), the petitioners operated assisted living residences that were ordered closed after the state fire marshal found the residents were incapable of "self-preservation." The petitioners sued for a declaratory judgment that the "self-preservation" requirement violated provisions of the Fair Housing Amendments Act (FHAA) and of the ADA. After the state legislature acted to eliminate this requirement and the case was dismissed as moot, the petitioners moved to recover attorney fees as the prevailing party under the "catalyst theory," which posits that a plaintiff is a prevailing party if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct. 532 U.S. at 601. The lower courts ruled against the petitioners, and the United States Supreme Court affirmed. The opening paragraph of the Court's opinion succinctly stated:

> "Numerous federal statutes allow courts to award attorney's fees and costs to the 'prevailing party.' The question presented here is whether this term includes a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct. We hold that it does not." 532 U.S. at 600.

The United States Supreme Court rejected the "catalyst theory" that had been recognized by some lower federal courts to determine the prevailing party and held the fee provisions of the FHAA and of the ADA require a party to secure either a judgment on the merits or a court-ordered consent decree to qualify as the prevailing party. 532 U.S. at 602-05. In so ruling, the Court reasoned that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." 532 U.S. at 605.

11

Federal courts do not follow the Supreme Court's holding in *Buckhannon* when it is superseded by statute. See, e.g., *Poulsen v. Department of Defense*, 994 F.3d 1046 (9th Cir. 2021) (finding that 2007 amendment defining "prevailing party" under Freedom of Information Act abrogated the rule of *Buckhannon* in claims for attorney fees under that Act). But otherwise, federal courts still follow the holding in *Buckhannon* in rejecting claims for attorney fees in cases dismissed as moot. See, e.g., *Suarez-Torres v. Panaderia y Resposteria Espana, Inc.*, 988 F.3d 542 (1st Cir. 2021) (district court properly denied plaintiffs attorney fees under ADA because defendant voluntarily agreed to make substantial changes in response to plaintiffs' complaint, and plaintiffs failed to demonstrate requisite judicial imprimatur on that outcome to make them prevailing parties); *Doe v. Dixon*, 716 F.3d 1041 (8th Cir. 2013) (dismissal on mootness ground did not result from plaintiffs prevailing on the merits of any of their claims, and plaintiffs were not entitled to prevailing party status simply because a voluntary change in conduct was recognized in the order of dismissal); *Walker v. Calumet City*, 565 F.3d 1031 (7th Cir. 2009) (award of attorney fees to property owner under 42 U.S.C. § 1988[b] as prevailing party in action against city was reversed because dismissal of case for mootness did not impose judicial imprimatur that would permit awarding attorney fees under *Buckhannon*). The statutes under which Roll seeks to recover attorney fees—42 U.S.C. § 12205 and 42 U.S.C. § 1988(b)—have not been amended to define "prevailing party" since the Supreme Court decided *Buckhannon*.

A review of the procedural history of this case shows that Roll did not prevail at any point in the litigation except for receiving an ex-parte temporary restraining order. But she lost on the merits of her claims in the district court, and she lost in the Court of Appeals. Although we cannot say she would have lost in our court, we also cannot say she prevailed in our court. Her own changed circumstances, not a judicial determination, resulted in her obtaining the relief she sought for six years. She did not obtain an alteration of the legal relationship of the parties, and she did not succeed on any significant issue in litigation which achieved some of the benefit she sought in bringing

12

the suit. She failed to secure a judgment on the merits or a court-ordered consent decree, although she received the desired result of her litigation. Simply put, Roll was not awarded any relief by any court on the factual and legal issues that were addressed by the court. We therefore conclude Roll is not entitled to attorney fees in a case that we dismiss as moot.

Appeal dismissed.

STANDRIDGE, J., not participating.
THOMAS E. MALONE, J., assigned.[1]

* * *

ROSEN, J., dissenting: I take issue with the majority opinion for what I consider two fundamental errors of reasoning. I will explain first that the lower courts reached incorrect decisions in denying Roll the relief she sought. I will next argue that, under the curious circumstances of this case, the appeal is not moot and Roll was the prevailing party.

*The Lower Court Decisions Were Fundamentally Flawed*

In my view, both the district court and the Court of Appeals got their decisions wrong. If they had ruled correctly, Roll would have prevailed before this appeal reached

---

[1]**REPORTER'S NOTE:** Judge Malone, of the Kansas Court of Appeals, was appointed to hear case No. 121,447 vice Justice Standridge under the authority vested in the Supreme Court by K.S.A. 2021 Supp. 20-3002(c).

us and we would not be concerned about whether mootness barred the request for attorney fees. I contend the strong likelihood of success on their appeal should enter into the calculus of whether Roll should be awarded fees and costs.

I initially note that I agree with the lower courts' analysis and conclusions regarding the Americans with Disabilities Act. Roll argued that the Act protected her from being forced to relocate to a community treatment setting, relying on statutory language that, standing in isolation, supports her position:  "Nothing in this chapter shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit which such individual chooses not to accept." 42 U.S.C. § 12201(d) (2018). The lower courts rejected her argument.

In a nutshell, nothing in that statute calls for placement in a more restrictive environment simply because that is what the disabled person desires. A state may offer to provide adequate services in a least-restrictive environment, and a disabled person may reject those services. The state is then free of its responsibility to provide residential services to that person. In other words, if a disabled person is living at home or in a private care facility, a state may not require that person to relocate to either a state hospital or a community-based residential program. But a state is not required to admit— or continue to locate—the person at whichever particular program the person prefers. See Chambers, *Integration as Discrimination Against People with Disabilities? Olmstead's Test Shouldn't Work Both Ways*, 46 Cal. W. L. Rev. 177, 195-96 (2009); *D.T. v. Armstrong*, No. 1:17-CV-00248-EJL, 2017 WL 2590137, at *8 (D. Idaho 2017) (unpublished opinion); *Sciarrillo ex rel. St. Amand v. Christie*, CIV.A. No. 13-03478 SRC, 2013 WL 6586569 (D.N.J. 2013) (unpublished opinion); *Richard S. v. Dept. of Developmental Servs. of California*, No. SA CV 97-219-GLT ANX, 2000 WL 35944246 (C.D. Cal. 2000) (unpublished opinion); *Richard C. ex rel. Kathy B. v. Houstoun*, 196 F.R.D. 288, 289 (W.D. Pa. 1999); *Illinois League of Advocs. for Developmentally, Disabled v. Quinn*, No. 13 C 1300, 2013 WL 3168758, at *5 (N.D. Ill. 2013)

14

(unpublished opinion). In short, I do not think Roll would have or should have prevailed on the ADA issue.

But I vigorously disagree with the courts below on two other critical points.

The first of these is the application of Medicaid statutes and regulations.

Medicaid is an optional, federal-state program through which the federal government provides financial assistance to states for the medical care of individuals in financial hardship. *Wilder v. Va. Hosp. Association*, 496 U.S. 498, 502, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990). Once a state elects to participate in the program, it must comply with all federal Medicaid laws and regulations. 496 U.S. at 502.

Under the Medicaid waiver program created by 42 U.S.C. § 1396n(c) (2000), states may waive the requirement that persons with "mental retardation" or a related disability live in an institution in order to receive certain Medicaid services. *Doe v. Kidd*, 501 F.3d 348, 351 (4th Cir. 2007). The program allows states to experiment with methods of care, or to provide care on a targeted basis, without adhering to the strict mandates of the Medicaid system. *Bryson v. Shumway*, 308 F.3d 79, 82 (1st Cir. 2002).

The "free choice" provision under the Medicaid Act waiver program, located at 42 U.S.C. § 1396n(c)(2)(B) and (C) (2018), requires states to provide assurances that they will offer to qualified individuals an evaluation for the need for inpatient hospital services, nursing facility services, or services in an intermediate care facility for the "mentally retarded." Furthermore, individuals who are "likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility" must be "informed of the feasible alternatives, if available under the waiver, *at the choice of such individuals*, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded." (Emphasis added.)

15

Moreover, 42 U.S.C. § 1396a(a)(23) (2018) expressly states that any individual eligible for assistance may obtain that assistance from "any institution" qualified to perform the required services and the individual's choice of who provides that assistance shall not be restricted. The Medicaid Act thus clearly states a free-choice intention.

The implementing regulation for the free-choice provision provides:

"(d) Alternatives—Assurance that when a beneficiary is determined to be likely to require the level of care provided in a hospital, NF, or ICF/IID [nursing facility, or intermediate care facility/individuals with intellectual disabilities], the beneficiary or his or her legal representative will be—

(1) Informed of any feasible alternatives available under the waiver; and

(2) *Given the choice of either institutional or home and community-based services.*" (Emphasis added.) 42 C.F.R. § 441.302(d) (2021).

In short, the free choice provision "gives recipients the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785, 100 S. Ct. 2467, 65 L. Ed. 2d 506 (1980).

Roll argues that 42 C.F.R. § 441.302(d) gives her the right to choose where she will reside, so long as her chosen facility provides the level of care that she is likely to require. She contends that, because the Hospital has demonstrated the ability to provide that level of care and because she has active treatment needs that the Hospital can satisfy, the Medicaid provisions of the Social Security Act and the implementing regulation give her the right to choose to remain at that facility. I agree. The record and the law, in my view, unquestionably demonstrate she has that right.

16

Witnesses and the trial court devoted considerable time and attention to two factors: (1) the reasons why the Hospital was seeking to move Roll into other care facilities, and (2) the ability of those alternative facilities to provide Roll with the care she requires. The general sense of that evidence and the related findings was that budgetary constraints compelled the Hospital to reduce its patient load and export those patients who are able to receive adequate care in other settings; the changing environment at the Hospital increased safety concerns for all its patients; and there are many care facilities around the state that, at least in theory, will provide Roll with good care.

To a large extent, this evidence and the trial court's related findings are a red herring. The question under this issue is not whether the Hospital's proposed relocation of Roll was reasonable, which it may have been. The question is whether Roll had a legally protected right to remain in her current setting, where it is uncontroverted that she was receiving excellent care and where she has felt comfortable and secure.

The Court of Appeals provided a perfunctory, two-paragraph analysis of the merits of Roll's claim, in essence holding that, if it is decided that a disabled person is likely to require only the level of care offered in a community-based service, then the statute does not require a state to offer the choice between institutional or community-based services. See *Roll v. Howard*, 59 Kan. App. 2d 161, 187, 480 P.3d 192 (2020). By this reasoning, a state may elect to offer the lowest common denominator of adequate care. The Court of Appeals cited to no authority for this limitation.

With this holding, the Court of Appeals implicitly added a proviso to the statutory language: If an individual is determined to be likely to require the level of care provided in an intermediate care facility (such as a community-based treatment center), then the only feasible choice that a state must give is an intermediate care facility or opting out to home care. The state is not required to offer the choice of a more intensive care facility.

17

But this is not what the statute or the regulation says. Repeating the statutory language quoted above, a state must provide that "individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, *at the choice of such individuals*, to the provision of *inpatient hospital services*, nursing facility services, or services in an intermediate care facility for the mentally retarded[.]" (Emphasis added.) 42 U.S.C. § 1396n(2)(c).

The Court of Appeals interpretation would make more sense if the Medicaid Act were an anti-discrimination statute, as the Americans with Disabilities Act is. Then it would be reasonable to assume that the less discriminatory—or more integrated—option would always be the statutorily preferred option. But the waiver is designed to give disabled individuals the *option* of accepting some treatment program other than institutionalization. See *Doe*, 501 F.3d at 359. It may be that most individuals would choose in-home or community-based services when those are available, but the Medicaid Act *does not require* that they choose those services.

The United States Supreme Court has explicitly held that the Medicaid Act

"gives recipients the right to choose among a range of qualified providers, without government interference. By implication, *it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified*. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified." (Emphasis added.) *O'Bannon*, 447 U.S. at 785.

I cannot see how the courts in the present case can get around this unambiguous language. The Hospital continues to be qualified. Roll has a right to choose among a

18

range of qualified providers without government interference. She enjoys an "absolute right" to remain in a home that continues to be qualified. She had the right to remain at the Hospital, even if she would not be admitted to the Hospital under today's admission criteria.

The right under the freedom of choice provision "is not so vague and amorphous that it cannot be judicially enforced; the statute and its corresponding regulations clearly illustrate that the freedom of choice provision establishes a two-fold right to both information about feasible alternatives and a choice of such alternatives, if available." *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1015 (D. Minn. 2016).

The statutory and regulatory language and the holdings of *O'Bannon* and lower courts line up precisely with Roll's position. Plaintiffs have lost when they have sought to force states to keep facilities open so that they may remain in those facilities or when they have sought to force states to establish new facilities so that they may have a greater range of choices. That is not the situation here. Roll wants to exercise her choice to stay where she is, in a treatment facility that is open and that clearly suffices to meet her needs.

Our Court of Appeals added a component to the Medicaid statute not contained in the statutory language. The court held that the choice provision only arises "*when a court has determined* someone is 'likely to require the level of care provided in' one of the facilities listed in the statute." (Emphasis added.) *Roll*, 59 Kan. App. 2d at 187. The statute makes no mention of courts stepping in to make the medical determination of which level of care a patient requires. Taking the Court of Appeals language on its face, every time a facility offers a patient a choice, it will have to obtain judicial approval of the choices available.

But more to the point, the statute makes no mention of offering only the services that meet a patient's minimum needs. Instead, the statute, as well as the Supreme Court in *O'Bannon*, states that the choice in treatment level lies with the patient, so long as the treatment option meets the patient's needs. The statute does not exclude options that exceed the minimum care requirements. Otherwise, the freedom of choice provision becomes basically meaningless:  a patient will only have the "option" to "choose" the kind of facility that provides the most basic services for the patient's needs.

So far, this analysis has not addressed a critical point that the defendants urged was dispositive in their favor. They contended Roll was not entitled to apply the freedom of choice provision to promote her cause because the statutory and regulatory language applies the choice option *only* to individuals who are "likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility," and not to those who will need less advanced care. 42 U.S.C. § 1396n(c)(2)(B) and (C). The Court of Appeals apparently agreed, judicially adding a component not contained in the Medicaid scheme.

The defendants' argument and the Court of Appeals conclusion stand in sharp contrast to the Supreme Court's ruling in *O'Bannon*:  "[The Medicaid statutory scheme] confers *an absolute right* to be free from government interference with *the choice to remain in a home that continues to be qualified*." (Emphasis added.) 447 U.S. at 785. If an individual has active treatment needs, such as Roll had and continues to have, then the individual enjoys the right to remain in a facility that is qualified to provide for those needs. The Hospital is such a facility.

To be sure, the district court held as a matter of law that Roll has no active treatment needs, meaning, at the very least, she would not qualify for Medicaid services. This ruling will be discussed in detail below, but I suggest that an elderly patient who requires medication to control schizophrenic psychosis, who has an IQ of 51, who needs

20

prompting before she uses the bathroom and requires assistance cleaning up afterwards, who has spinal deformities, who is barely able to speak in complete sentences, who requires assistance in making dietary choices, and who has been the subject of detailed annual active treatment plans for decades has active treatment needs. This is sufficiently the case such that the staff of one community facility that the guardians visited, who was familiar with Roll from the Hospital, informed the guardians that she probably required more treatment than the facility would be able to provide. Put another way, she obviously had active treatment needs because, if she did not have such needs, then it wouldn't have mattered whether she was in a dedicated care facility, and she might not even have qualified under Medicaid regulations for placement in a community-based residential center.

The Medicaid Act does not state, as the defendants claim, that individuals who are determined to be likely to require the level of care provided *only* in a hospital must be informed of feasible alternatives. Such a limitation is not in the statute; it has been added by the defendants and the lower courts. That limitation eviscerates the free choice language of the Medicaid Act and the regulations, which allow an individual to choose among hospitals, intermediate care facilities, and home services, so long as any of those options provide the individual with the care he or she needs. Assuming, based on the uncontroverted evidence presented to the district court, that Roll had special needs, the freedom-of-choice provision applied to her.

Neither the statute nor the regulation limits the choice provision to a situation in which an individual requires the highest levels of care available. Instead, under the Medicaid Act, its implementing regulations, and Supreme Court precedent, the treatment facility, wherever the individual is choosing to remain, must be able to provide the level of care that the beneficiary is likely to require. This assures that the beneficiary will actually receive the needed care; it is not an escape valve for facilities to eject people with disabilities.

21

The regulations speak of "any feasible alternatives," not just the alternatives that are most convenient for hospitals seeking to download their less-intensive needs patients. This would explain why qualifying beneficiaries must be "[g]iven the choice of either *institutional* or home and community-based services." (Emphasis added.) 42 C.F.R. § 441.302(d)(2).

It should be remembered that the Hospital was not trying to relocate Roll because it is an inappropriate setting for her in treatment terms; it was seeking to relocate her because of budgetary and space concerns. If the court is to believe the defendants and their witnesses, the Hospital has been very careful to comply with Medicaid requirements, meaning that Roll has had active-treatment needs and the Hospital has been meeting those needs for decades. But the defendants did a 180-degree turn when they tried to compel her to leave the Hospital, maintaining that she was not likely to require the kind of care the Hospital provided.

For all the apparent complexity this analysis entails, it boils down to a simple conclusion: the Medicaid statute and regulations required that Roll have the choice to remain at the Hospital, a legal reality that both the district court and the Court of Appeals refused to acknowledge.

I now turn to the factual conclusions that the district court reached and that the Court of Appeals affirmed. Rarely will this court dispute a district court's factual findings, but, in this case, those findings were completely at odds with the uncontroverted evidence before it.

The district court concluded Roll was not in "active treatment" at the Hospital. The Court of Appeals determined that the district court conclusion was supported by

competent evidence and it would not reweigh the evidence on appeal. *Roll*, 59 Kan. App. 2d at 173-74.

The question of whether Roll was receiving active treatment has more profound implications than either of the courts below gave it. If it is legally correct that Roll was not in active treatment, then she had no protection under the Medicaid Act and she was not entitled to exercise the choice provision discussed above. More importantly, however, it is likely she was not entitled to placement in any Medicaid-supported care facility. If she was not in active treatment, then the detailed treatment plans that were developed and submitted for her over many years at the Hospital were basically nullities and nothing more than a scheme to defraud the federal and state governments.

I take the position that both the trial court and the Court of Appeals erred in determining that Roll was not in active treatment. The uncontroverted evidence before the trial court was that she was in active treatment, both in a common-usage sense and in a legal sense. "Active treatment" is a term of art under the Medicaid Act, and both courts below failed to analyze the active treatment condition in the context of Medicaid requirements.

Because the term "active treatment" is a legal term of art, whether the factual findings support the legal conclusion that Roll required such treatment is a mixed question of fact and law. This court generally reviews the factual findings under the substantial competent evidence standard but exercises unlimited review of the conclusions of law based on those facts. See *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017).

Federal regulations require that recipients of Medicaid benefits, such as Roll, participate in an "active treatment program," and the regulations define active treatment:

23

"(1) Each client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart, that is directed toward—

(i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and

(ii) The prevention or deceleration of regression or loss of current optimal functional status.

"(2) Active treatment does not include services to maintain generally independent clients who are able to function with little supervision or in the absence of a continuous active treatment program." 42 C.F.R. § 483.440(a) (2021).

Without mentioning that regulatory definition, the district court explicitly found that Roll was not receiving active treatment, but the court's journal entry is internally inconsistent. In one section, it states:

"31.    [These] *treatment professionals* come from several disciplines, including psychologists, social workers, medical doctors, nursing staff, direct support staff, vocational client training supervisors and activity specialists. These *treatment professionals actively provided care and support* to Ms. Roll throughout her stay at Parsons State Hospital.

"32.    The services offered by these professionals included *psychological services, medical services, teaching, facilitating and assisting in daily life skills, leisure skills, vocational training skills and communication skills.*" (Emphases added.)

In another section, however—the section that is the subject of Roll's appeal—the district court held:

"Ms. Roll does not display behavioral issues which would indicate she has active treatment needs. *Given that Ms. Roll has no active treatment needs*, members of Ms. Roll's treatment team at Parsons State Hospital have simply been providing supervision to Ms. Roll, which can be accomplished in a community based setting.

"Examples of behaviors which would demonstrate active treatment needs includes an inability to employ self-help skills, an inability to work, an inability to communicate, an inability to control one's temper, an inability to respond to supervision, problems with elopement and an inability to address safety, health or hygiene needs." (Emphasis added.)

Then, later, the district court explained that certain community-based facilities will be able "to meet her treatment needs." It is unclear why the district court thought that Roll would be able to find placement that could comport with her treatment needs when it also held that she had no treatment needs.

Administering medication, adjusting prescriptions, providing physical therapy, teaching life skills, preventing or slowing regressive behavior and ideation—these are all "treatments." For example, Eric Schoenecker, a psychologist and defense witness, testified that psychotropic medication, such as the Loxitane that Roll was taking, can have "a dramatic effect on the behavior aspects of an individual's daily living," and for this reason it was important to monitor both medication and behavioral and nonmedicinal therapies. He also testified that Roll has scoliosis and is developing cataracts. These are examples of health and behavior issues requiring active treatment.

The online Merriam-Webster dictionary defines "treatment" as "the action or way of treating a patient or a condition medically or surgically:  management and care to prevent, cure, ameliorate, or slow progression of a medical condition." https://www.merriam-webster.com/dictionary/treatment?src=search-dict-box. The same dictionary defines "active" as "characterized by action rather than by contemplation or

25

speculation . . . having practical operation or results." https://www.merriam-webster.com/dictionary/active?src=search-dict-box. By these definitions, Roll was receiving active treatment and had active treatment needs.

But, more importantly, a parade of defense witnesses testified that Roll was receiving active treatment; she had active treatment needs; and, in response to those needs, they developed active treatment plans that they provide to staff, guardians and family members, and the government agencies that administer Medicaid programs. Furthermore, their testimony was uncontroverted; it was, after all, the defendants' position that they were in compliance with statutory and regulatory requirements, and it was Roll's position that she required active treatment. Either the district court simply ignored the explicit, emphatic testimony of those witnesses, or it deemed the defendants' witnesses to be completely untrustworthy. If the court considered the defendants' witnesses to be unreliable, it gave no explanation for such a conclusion. It even adopted their other testimony wholesale into its factual findings. It was not the plaintiff who was second-guessing the healthcare professionals; it was the district court.

The following witnesses testified that Roll was in active treatment:

Dr. Jerry Rea, formerly the Hospital director, testified that Roll met the federal requirements for implementing an active treatment program and that she was in "active treatment." Eric Schoenecker, a staff psychologist, testified that Roll was currently "under active treatment" and she "meets the standards for being at Parsons." Robyn Thomas, a clinical psychologist on the Hospital staff, testified that she worked with Roll on achieving "active treatment training objectives." Karen VanLeeuwen, the director of Hospital social services, testified that Roll was in active treatment at the time of the hearing and the active treatment was in most of the areas available for treatment and in "all the self-care areas." These were all witnesses called by the defendants. The transcript

26

contains no testimony or other evidence that Roll did not have active treatment needs or was not receiving active treatment.

Without explanation, the district court limited its understanding of "active treatment needs" to "behavioral issues." There is no statutory or common-usage basis for such a limitation. Furthermore, the uncontroverted evidence established that, in the absence of psychotropic medication and behavioral treatment, Roll's schizophrenia led to paranoid, delusional, and violent behavior. When she was temporarily taken off a psychotropic medication, her behavior became much more aggressive, including putting her fist through a window and aggression toward other residents, and she began to hallucinate. The fact that active treatment had that condition under control does not mean that she had no behavioral issues and no active treatment needs.

Defense witness VanLeeuwen testified that Roll's active-treatment needs included determining and teaching needed adaptive behaviors, improving independent leisure skills, improving independent functioning skills, and improving personal safety skills. These are not "behavioral issues" in the sense that Roll was exhibiting violent or uncooperative behavior, but they were issues in improving, maintaining, or slowing the regression of Roll's quality of life and ability to function among other human beings. Even if one pretends that such services are not "active treatment," it is close to impossible to understand how monitoring, adjusting, and administering medicine for the control of schizophrenic illness does not fall within the purview of "active treatment." The district court even listed medication stabilization as an "active treatment need."

The district court relied on the testimony of defense witnesses to conclude that Roll was highly successful in meeting her "treatment objectives." Based on this success, the court seems to have inferred that she was not in active treatment. Apparently, a patient who is responding well to active treatment is not in need of active treatment and is not currently in active treatment.

27

The Court of Appeals deferred to the district court's evaluation of the evidence, holding there was simply a difference of opinion between Roll's guardians and the Hospital's medical professionals. That court concluded the district court's findings were supported by substantial competent evidence in the record. *Roll*, 59 Kan. App. 2d at 173-74.

There are at least two problems with this appellate analysis. Although both the district court and the Court of Appeals treat this as a purely factual question, subject to a court's common-sense understanding of what constitutes "active treatment," it is more in the nature of a legal conclusion. As set out above, 42 C.F.R. § 483.440(a) defines "active treatment" and makes it a requirement for receipt of general Medicaid assistance. The regulation refers to "a program of specialized and generic training, treatment, health services and related services." Neither the district court nor the Court of Appeals applied the evidence before them to the regulatory definition.

The second problem with the Court of Appeals analysis is its determination that the question was simply "a difference of opinion between what Roll's guardians believe to be active treatment and the descriptions of the Parsons medical staff." 59 Kan. App. 2d at 173-74. But the Parsons medical staff unanimously agreed with Roll's guardians that Roll has active treatment needs and was receiving active treatment at the Hospital—there was no difference of opinion about whether Roll is receiving active treatment. The difference of opinion lay in whether Roll would continue to receive active treatment meeting her particular requirements if she were transferred to a community-based program.

Why does this matter? Finding otherwise could potentially put Hospital staff at risk for charges of Medicaid fraud for submitting plans for treatment needs when no such

28

needs existed. And further, Roll might lose her eligibility for future Medicaid benefits, possibly even having to repay past benefits.

The matter is relevant for deciding whether Roll had a right to make a free choice of providers of active treatment services under the Medicaid Act, as discussed above. If she was not in active treatment and did not have active treatment needs, then neither the Hospital nor intermediate care facilities would be providing services that she needed because she did not actually need active treatment services. This would undermine her argument that Medicaid law entitled her to a choice of whether to stay in her current placement or transfer to some other facility.

This may have been the point of the district court's finding: if Roll was not receiving active treatment, then she did not have a legal right to remain at the Hospital, and the courts should not be involved in evaluating whether this or that community-based center was able to meet her needs. The shortcut for getting the courts out of that decision-making process was to hold she had no active treatment needs. The defendants considered the shortcut to their advantage because it lightened the burden on them to transition Roll into some other facility, which could be any other facility at all if she had no active treatment needs.

But this shortcut is at odds with the uncontroverted evidence in the record and the requirements of the Medicaid program. The evidence was clear and overwhelming that Roll was in active treatment and had active treatment needs that were being met at the Hospital. She was therefore entitled to exercise her statutory choice and continue to reside at the Hospital.

In summary, both the district court and the Court of Appeals made clearly reversible errors in both their legal and factual conclusions.

*The Appeal Is Not Moot and Roll Is Entitled to Attorney Fees and Costs*

If Roll had been doing nothing through her appeal but prolonging litigation to needlessly eke out a few more years of residence at the Hospital, I would be inclined to join the majority and dismiss the appeal as moot. But, as I have argued above, her case has been meritorious from the time it was before the district court. It is the defendants who unnecessarily consumed the time of the appellate courts by failing to notify these courts that Roll's conditions were changing dramatically and her needs were increasing, even further undermining the district court's factual findings and forcing the defendants to change their position with respect to her residency at the Hospital.

Taking their pleadings on their face—and the defendants have not challenged the amount claimed—Roll has incurred attorney fees amounting to over $160,000 in prosecuting this litigation. If she had not prosecuted this litigation, the defendants would have transferred her, in violation of her rights under the Medicaid Act, back in 2016. The majority opinion gives similarly situated plaintiffs a harsh choice: fight for their rights, but, if the defendants jump out of the litigation at the last possible minute, they are left hammered with the costs of litigation; or surrender their rights because they cannot afford to risk a last-minute acquiescence by the defendants. I am firmly convinced this is not the choice that Congress intended plaintiffs in civil-rights based actions to face when it enacted 42 U.S.C. § 1988(b).

Fee shifting plays a significant role in civil rights litigation. It is intended to encourage compliance with civil rights statutes. See, e.g., Hylton, *Fee Shifting and Incentives to Comply with the Law*, 46 Vand. L. Rev. 1069, 1070 (1993). The decision of the majority today has the opposite consequence: it discourages parties from successfully litigating to protect their rights by incurring the costs of the litigation when they obtain the sought after relief.

I conclude the mootness doctrine does not deprive Roll of an award of fees to which she is statutorily entitled.

First, she stated a demand for attorney fees as a separate count in her original petition. That demand constitutes a distinct, justiciable interest. A case is moot when "'the only judgment that could be entered would be ineffectual *for any purpose*, and it would not impact *any of the parties' rights*.'" (Emphases added.) *State v. Roat*, 311 Kan. 581, 584, 466 P.3d 439 (2020). Here, the award of attorney fees is a substantial right, and it is a right to which Roll is entitled as the party who, as a consequence of this litigation, obtained the relief she sought.

If an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatsoever to the prevailing party, the appeal must be dismissed. But the possibility of the award of costs means an appeal is not moot in its entirety. See, e.g., *Landrith v. Hazlett*, 170 Fed. Appx. 29, 31 (10th Cir. 2006) (unpublished opinion) (citing *Church of Scientology v. United States,* 506 U.S. 9, 12-13, 113 S. Ct. 447, 121 L. Ed. 2d 313 [1992]).

Second, Roll sought injunctive relief in the district court. Injunctive relief means not only that a defendant is barred from taking some action today; injunctive relief is also prospective in effect. In general, "an injunction is not an appropriate action to obtain relief for past or completed acts but operates only *in futuro* to prevent later acts." *Andeel v. Woods*, 174 Kan. 556, 557, 258 P.2d 285 (1953). In addition to a temporary restraining order, Roll sought a permanent injunction. I do not see how a permanent injunction can become moot simply because a defendant backs away from an intended course of action.

If I follow the majority's reasoning, whenever a plaintiff seeks injunctive relief, defendants can moot the action and avoid paying attorney fees by declaring that they have changed their minds. But prospective relief in a situation such as this does not

31

become moot simply because a party avers it has changed its mind. In *United States v. Washington*, 596 U.S. ___, 142 S. Ct. 1976, ___ L. Ed. 2d ___ (2022), after the Supreme Court granted certiorari, the defendant averred that a putatively discriminatory statute had been amended to remove the offending terms and that the amendment would be effective retroactively. The Supreme Court declined to dismiss the case as moot, holding that promises of retroactive effectiveness would not undo the legal merits of challenges to the statute before it was amended. 142 S. Ct. at 1983.

In the present case, we have no factual findings and no court determinations that Roll's condition has declined so as to create different active treatment needs. We also have no binding agreement that the defendants will not once again reverse their course of action. Apparently, the court majority deems it sufficient for a defendant to simply declare there won't be any future harm in order to avoid a court order and the consequent payment of fees. And it is also sufficient for a defendant to declare that it has decided to give the plaintiff the relief she has fought for in order to avoid the plaintiff becoming the prevailing party.

No fact-finding has taken place and no judicial determination has been made confirming the allegations by the defendants that they were motivated by recent changes to Roll's condition and that they will never again seek her transfer. We also have the guardians' allegations, supported by documented communications between them and the Hospital staff, showing that Roll's condition had deteriorated far below the level of care possible in less-intensive care facilities long before review was even sought in this court. The majority simply accepts the defendants' bald allegations regarding the circumstances and consequences of the change.

This court has acknowledged an attorney fee claim can serve as the basis for appellate review in cases where a party has both requested attorney fees and prospective relief in the form of declaratory judgment or injunction. See, e.g., *Baker v. Hayden*, 313

Kan. 667, 675-76, 490 P.3d 1164 (2021); *Willis v. Kansas Highway Patrol*, 273 Kan. 123, 41 P.3d 824 (2002). This court may still review the lower court rulings and award Roll a permanent injunction. This is more than a minimal or trivial interest; it is relief that she requested and that extends to govern future action, not to redress some past harm. See *City of Mesquite v. Aladdin's Castle, Inc*., 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982) (well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine legality of the practice; prospective nature of injunctive relief empowers courts to prevent future abuse).

I further contend that Roll prevailed in this litigation. To be sure, the defendants jumped ship before this court issued an opinion, but that does not change the reality that Roll remained in the Hospital because she litigated this action. Remaining in the Hospital was the essence of her action, and she succeeded in obtaining and preserving a restraining order up through the time that the defendants backed away from their decision.

A "prevailing party" is the party that "has been awarded some relief by the court." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dept. of Health & Hum. Res.*, 532 U.S. 598, 603, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001). Obtaining preliminary relief can suffice to award a party prevailing party status:

> "A preliminary injunction is a form of court-ordered relief. Thus, '[a] preliminary injunction issued by a judge carries all the "judicial imprimatur" necessary to satisfy *Buckhannon*.' *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002); see also *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 233 n. 5 (3d Cir. 2008) ('We need not determine in this case the outer limits of the requisite "judicial imprimatur." Whatever those may be, preliminary injunctions are certainly within them.' (citation omitted))." *Kansas Jud. Watch v. Stout*, 653 F.3d 1230, 1237 (10th Cir. 2011).

As the Tenth Circuit has held: "[I]f a preliminary injunction satisfies the relief-on-the-merits requirement, the plaintiff qualifies as a 'prevailing party' even if events outside

33

the control of the plaintiff moot the case." *Kansas Jud. Watch*, 653 F.3d at 1238. A defendant's acquiescence in the relief sought by a plaintiff does not necessarily protect the defendant from paying fees. "[A] party may be considered to have prevailed even when the legal action stops short of final appellate, or even initial, judgment due to a settlement or intervening mootness." *Grano v. Barry*, 783 F.2d 1104, 1108 (D.C. Cir. 1986).

Roll preserved the status quo, which had the effect of staving off action by the defendants until they decided they no longer deemed Roll's transfer medically or legally defensible. This demonstrates there was a change in the legal relationship of the parties that endured until the defendants requested dismissal.

The United States Supreme Court has recognized that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. . . . The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S. Ct. 894, 97 L. Ed. 1303 (1953). In an earlier decision, the Court stated: "Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power." *Walling v. Helmerich & Payne*, 323 U.S. 37, 43, 65 S. Ct. 11, 89 L. Ed. 29 (1944); see also *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 309, 17 S. Ct. 540, 41 L. Ed. 1007 (1897) (dissolution of illegally constituted assembly after judgment is entered does not deprive court of appellate jurisdiction).

Again, the court majority disagrees with our Supreme Court and holds today that ongoing unlawful conduct may be condoned if the wrongdoer bails out of the litigation right before final judgment is handed down. But this is a wrong way of looking at prevailing-party status.

34

In ordinary litigation, we don't concern ourselves with who is technically the "prevailing party." It's enough to observe that plaintiffs have achieved what they set out to achieve, whether by court order or by agreement of the defendants. But this case challenges us to determine who prevailed, and, in my view, Roll definitely prevailed. When the defendants announced they were giving her the relief she sought after years of litigation, she prevailed. Simply tossing in one's cards and walking away from the table doesn't mean that no one won; the party that stayed the course and ultimately received what it set out to get is the party that won.

The defendants and the court majority want this determination to focus on Roll's changed condition. Her changed condition may be what prompted the defendants to change their direction (albeit long after her condition changed), or the threat of paying attorney fees may be what prompted their change of direction, but it really doesn't matter. Roll won. She is getting what she fought for, and the defendants cannot avoid her winning by announcing they're not playing the game anymore.

The majority correctly notes that the United States Supreme Court rejected the so-called "catalyst theory" for determining whether a party has prevailed. See *Buckhannon*, 532 U.S. at 610. The present case, however, does not present a catalyst situation, and, given the procedural history of this case, the majority's discussion is not relevant to the attorney fees analysis.

In order to constitute a "catalyst," a threat of suit or initiation of a legal action is the motivating force that leads a defendant to voluntarily grant the relief that a plaintiff seeks. The granted relief is a voluntary action by the defendant, not the result of a changed legal relationship between the parties. See *Buckhannon*, 532 U.S. at 603-04.

35

In the present case, the defendants would have discharged Roll into some form of local care in 2016 if the courts had not stayed the change of her treatment facility. If we are to take the defendants' motion for dismissal at face value, as the majority does, the defendants would have continued their fight to discharge her until this court rendered a decision. While it is true that the restraining order and subsequent stays merely preserved the status quo, the defendants elected to request dismissal before this court had the opportunity to weigh in on the merits. The defendants did not "voluntarily" abandon this case; they were no longer able to carry out the discharge because it became impossible to place Roll somewhere else. The plaintiff's lawsuit was not the catalyst for the defendants to abandon their plan to transfer Roll. The restraining order and Roll's eventual decline prevented the defendants from taking the action they sought to carry out for some six years. See, e.g., *Select Milk Producers, Inc. v. Veneman*, 304 F. Supp. 2d 45, 52 (D.D.C. 2004) (plaintiffs were prevailing parties for two reasons despite only obtaining a preliminary injunction before litigation became moot: first, injunction created material alteration in parties' legal relationship; and second, change in relationship resulting from injunction was the exact relief plaintiffs sought), *aff'd in relevant part sub nom. Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 942 (D.C. Cir. 2005); *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002) (preliminary injunction carried judicial imprimatur necessary to satisfy *Buckhannon* where plaintiff obtained injunction preventing county from using report at his termination hearing; when case subsequently became moot, attorney fees were appropriate although claim for permanent injunctive relief was not decided on the merits, it was important to decision that "preliminary injunction was not dissolved for lack of entitlement" but rather "was rendered moot" after the employment termination hearing was over, "after the preliminary injunction had done its job"); *Young v. City of Chicago*, 202 F.3d 1000, 1000-01 (7th Cir. 2000) (upholding award of attorney fees to plaintiff who obtained preliminary injunction against city's establishment of security perimeter excluding protesters from areas

36

around site of 1996 Democratic National Convention, but whose claims became moot after convention ended and no final judgment on the merits was ever entered).

Perhaps one might be more sympathetic to the defendants if they had filed their notice of changed circumstances before the Court of Appeals entered its judgment. The record shows the Hospital was aware of Roll's cognitive decline and significant behavioral problems for several months before the Court of Appeals' ruling, and Roll's CT scan and further indicators of behavioral and mental decline were well known to the staff before this court granted Roll's petition for review. Even after her condition declined dramatically, the defendants sought a district court order to terminate the stay and allow them to place her in a community-based facility.

In other words, the "changed circumstances" changed well before Roll's guardians incurred the expense and stress of arguing this case before this court. But instead of conceding that Roll would receive her requested relief, the defendants put both Roll's guardians and this court through a time-consuming and costly appellate review. If this case were truly moot, as the defendants and the majority contend, then it was the defendants who elected to beat a moot horse for at least another eight months.

I would hold that the case is not moot and would decide it on its merits. Even if the defendants promise they will not seek future removal of Roll from the Hospital, I would deem Roll the prevailing party for having protected and preserved her residency at the Hospital during the entire time the defendants sought to remove her.

*Conclusion*

The district court ignored the uncontroverted evidence—which the defendants' own witnesses provided—that she had active treatment needs and was receiving active

37

treatment for those needs at the Hospital. It relied on unsupported and counterfactual conclusions that it drew from that evidence to reach an incorrect legal conclusion about Roll's rights under the Medicaid Act. The Court of Appeals engaged in an erroneous review of those factual determinations and the legal conclusion, inviting reversal by this court.

Roll was able to obtain a judicial stay on her transfer, a stay that remained in effect until the defendants proclaimed they no longer intended to transfer her. It was only shortly after oral argument before this court that the defendants, perhaps feeling the heat of a looming large attorney-fee award, announced they would no longer seek to remove Roll from the Hospital. Through her persistent litigation, Roll finally prevailed in this case, entitling her to attorney fees. This appeal was not moot, which this court demonstrated by continuing to exercise jurisdiction until now.

I would retain jurisdiction and correct the wrong lower-court results which now flap loosely in the caselaw breeze, and I would award fees and costs to Roll as the prevailing party.

BILES, J., joins the foregoing dissenting opinion.